976 A.2d 300

**Lanay BROWN**

v.

**The DANIEL REALTY CO., et al.**

**No. 77, Sept. Term, 2008.**

Court of Appeals of Maryland.

July 22, 2009.

Brian S. Brown (Saul E. Kerpelman & Associates, P.A. of Baltimore), on brief, for petitioner.

Thomas J. Cullen (Michele R. Kendus and Derek M. Stikeleather of Goodell, DeVries, Leech & Dann, LLP of Baltimore), on brief, for petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, WILNER, ALAN M. (Retired, Specially Assigned), JJ.

HARRELL, J.

## Facts

Lanay Brown ("Petitioner" or "Lanay"),[1] was born on 17 December 1990. Since her birth, her maternal aunt, Catherlina Queen, raised her. At some time early in Lanay's life, she and her aunt moved into a property on Reisterstown Road in Baltimore City ("the Subject Property"),[2] where they resided until 1994. While Lanay and Ms. Queen lived there, the Subject Property was owned by the Daniel Realty Company and allegedly managed by, among others, Daniel and Wendy Perlberg (collectively "Respondents"). In October 1995, Daniel Realty sold the Subject Property; thereafter, no Respondent retained an interest in it. They had no knowledge of what, if any, repairs were performed on the Subject Property after 1995.

At some point after Lanay and Ms. Queen moved out of the Subject Property, Ms. Queen became suspicious that Lanay may have been exposed to lead by ingesting peeling and flaking lead-based paint while residing at the Subject Property. Accordingly, she sought the advice of counsel. In 1999, counsel for Lanay and Ms. Queen hired ARC Environmental ("ARC"), an environmental consulting firm, to test the rooms and structures of the Subject Property for the presence of lead in paint. ARC's tests revealed the presence of lead-based paint. Three years later, when Lanay was 11 years old, Ms. Queen, as her next friend, sued Respondents, alleging that Lanay was exposed to peeling and flaking lead-based paint at the Subject Property which caused her to suffer permanent brain damage. Ms. Queen, in her own right, also sued Respondents, seeking damages as a result of medical expenses that she incurred caring for Lanay, as well as for severe emotional distress.

---

1. Meaning no disrespect, at times we shall refer to Lanay Brown by her first name.

2. One of the disputed facts in this case was whether Lanay lived at another address as a newborn, where she possibly was poisoned by ingesting lead-based paint chips or dust.

Counsel for Lanay and Ms. Queen conducted a *de bene esse* deposition of ARC's President, Shannon Cavaliere, an environmental expert. He identified the report that ARC prepared in May 1999 as the result of its testing the Subject Property ("the Un–Redacted ARC Report"). The Un–Redacted ARC Report included a "Lead–Based Paint Testing Data Sheet" summarizing the findings of the technicians who conducted the testing. The data sheet included descriptions of the tested rooms and structures, the levels of lead (if any) detected, and the condition of the paint at the tested locations. With the exception of two of the 38 locations tested at the Subject Property, the Un–Redacted ARC Report described the conditions of the paint as "intact," meaning that none of the paint was chipping, peeling, flaking, or otherwise separating from the substrate. The two locations where the paint was not "intact" were described as "fair," defined as meaning that 10% or less of the surface was cracked or worn.

Mr. Cavaliere explained that his technicians used an XRF [3] machine, capable of detecting lead below the top layer of paint, which led him to conclude that two-thirds of the tested locations in the Subject Property contained lead-based paint. On cross-examination, he conceded that an XRF machine does not ascertain whether the detected lead is in the outermost layer of paint, the lowest layer of paint, or anywhere specifically in between. Thus, a structure or surface painted at one time with lead-based paint, but subsequently painted over one or more times with unleaded paint, could yield a positive reading by an XRF machine. Mr. Cavaliere acknowledged that other testing devices (not used here) are capable of determining how close the detected lead is to the surface of a tested location.

The jury trial began on 19 June 2006 in the Circuit Court for Baltimore City and concluded nine days later. Ms. Queen testified during the plaintiffs' case-in-chief that, when she and Lanay first moved into the Subject Property, the paint was in

---

**3.** X-ray fluorescence.

good condition; however, five or six months later, the paint began peeling and chipping in several locations. On cross-examination, Respondents impeached Ms. Queen with her pre-trial deposition testimony. In doing so, they inferentially undermined her memory of the Subject Property by pointing out inconsistencies regarding who lived at the Subject Property with her and Lanay when the alleged exposure occurred.

Lanay and Ms. Queen did not offer the *de bene esse* deposition (or any part thereof) of Mr. Cavaliere in their case-in-chief; instead, they called Dr. Jerome Paulson, an expert in childhood lead poisoning. Dr. Paulson is a pediatrician and a professor of environmental and occupational health at the School of Public Health of George Washington University. Based on the results of ARC's testing, he opined that Lanay was exposed to lead-based paint at the Subject Property. Referring to the May 1999 testing by ARC, he commented, "we have documentation from an inspection done of the home at that address that there was lead paint on the surface, on multiple surfaces at that address. Lead-based paint was found at over 20 sites at that address when the home was inspected in May of 1999." Counsel for Lanay and Ms. Queen then approached Dr. Paulson with a copy of the 1999 ARC report; however, in this copy, the description of the condition of the paint at the tested locations on the data sheet was redacted ("the Redacted Version").[4] The following exchange occurred:

> [Plaintiffs' counsel:] Dr. Paulson, I'm showing you what has been marked as Plaintiffs' Exhibit Number 1 for identification. Can you tell me that's a fair and accurate yet redacted copy of the report that you relied upon to determine that there was lead paint at [the Subject Property]?
>
> [Defendants' counsel]: Objection. He said redacted copy? I don't want I don't want—to speak out here but—
>
> . . . .

---

4. The existence of the Redacted Version was not a surprise to Respondents. It had been marked for identification during the *de bene esse* deposition of Mr. Cavaliere.

My problem is, your Honor, he gave his expert witness materials to rely upon, which he did and I'm entitled to see that in its form that he received it. Not in a redacted form—

[Trial Judge]: All right. Wait. So what you are telling me is that you were—Dr. Paulson has now seen the unredacted version of the exhibit?

[Plaintiffs' counsel]: That's true.

[Trial Judge]: Why did you give him a redacted version?

[Plaintiffs' counsel]: Because the portion that we redacted pertains to the condition of the property, the actual physical condition of the paint itself in 1999, five years—

. . . .

. . . [I]t pertains to the condition of the property, the paint. Whether the paint in 1999, was chipping, peeling, or flaking.

[Trial Judge]: But why would you show him a document with some information omitted?

[Plaintiffs' counsel]: Because that's the point, your Honor, why it's redacted. The condition of the paint in 1999—

[Trial Judge]: You did not want him to consider that?

[Plaintiffs' counsel]: It has nothing to do with the condition of the paint in 1990 when Lanay was living there.

[Trial Judge]: Okay. And, so, your problem is[?]

. . . .

[Defendants' counsel]: First of all, this witness has seen an un-Redacted copy—

[Trial Judge]: And when was that?

[Defendants' counsel]:—that was in his file when he made his opinion in this case.

[Trial Judge]: So during deposition he referred to an unredacted copy?

[Defendants' counsel]: It was in his records, absolutely. So that's an incorrect statement. I'm entitled to show the jury what he saw to rely on. Now, accurate. He saw the unredacted version—

[Trial Judge]: Okay. I'm going to let [Plaintiffs' counsel] hand [Dr. Paulson] a redacted copy. When you get him on cross you can show him an un-redacted copy.

[Defendants' counsel]: Okay.

[Trial Judge]: All right [Plaintiffs' counsel], you may proceed.

. . . .

[Plaintiffs' counsel]: Now [Dr. Paulson], is Exhibit 1 the redacted version of the report that you used to determine that there was lead based paint at [the Subject Property]?

[Dr. Paulson]: Yes.

[Plaintiffs' counsel]: What was the date of that report again, Dr. Paulson?

[Dr. Paulson]: May 26, 1999.

[Plaintiffs' counsel]: Let me ask you this question. Can you explain to the members of the jury how you can use a test for lead in 1999 to determine whether Lanay was exposed back in 1990 to 1994?

[Dr. Paulson]: The lead-based paint that's placed on a wall or a floor, or a door jam does not deteriorate over time. So once it stays there unless it's physically removed it is, it's there. So that's one point.

Also, since 1978 it has been illegal to use lead-based paint for painting interior surfaces in homes. So if one were to assume that there was no lead-based paint at [the Subject Property] at the time Lanay Brown lived there and that there is lead-based paint or there was lead-based paint on May 26, 1999, one would have to assume that the house, the interior of the house had been painted with lead-based paint between the time she moved out and the time that this test was done. Given the age of the home it is very likely that the home was painted with lead-based paint when it was built after it was built and that that's the origin of lead-based paint. It would make no sense that between 1994 when the family moved out of that address in 1999 someone would have gone in and something illegal, that is paint, use lead-based paint in a house.

Dr. Paulson concluded that, in his expert opinion, this exposure caused Lanay to suffer lead poisoning. Following the close of plaintiffs' case-in-chief, the trial judge granted Respondents' unopposed motion for judgment as to Ms. Queen's individual claims.[5]

In their defense, Respondents adduced evidence that, before moving to the Subject Property, Lanay lived at another house in Baltimore City, insinuating that, if she was poisoned by lead, her exposure may not have occurred at the Subject Property. Additionally, Daniel Perlberg, who managed the Subject Property until 1995, testified that he painted and wallpapered the Subject Property before Ms. Queen and Lanay moved in and continued performing repairs and painting while Ms. Queen and Lanay lived there. Respondents also introduced evidence that Ms. Queen's parents (Lanay's grandparents), who signed the lease for the Subject Property, inspected the property and did not find any defects. Furthermore, Respondents introduced a 1992 inspection report of the Subject Property prepared by the Baltimore City Health Department's Childhood Lead Poisoning Prevention Program. The report form allowed for the inspector to circle "loose paint/plaster" as one of the potential "Hazardous items around the home"; however, the inspector who filled-out the form for the Subject Property did not circle it. Moreover, the inspector's notes attached to the report revealed that Ms. Queen stated, at the time, that Lanay was poisoned at a previous address.[6],[7]

---

**5.** The trial judge also granted Respondents' motion for judgment on three counts of the complaint that was brought by Lanay, through Ms. Queen as her next friend, pursuant to Maryland's Consumer Protection Act.

**6.** Though admitted at trial, the inspector's notes were not part of the record on appeal. They were added through a consent motion of the parties.

**7.** Respondents' counsel, during plaintiffs' case-in-chief, cross-examined Ms. Queen on whether she recalled telling the Health Department inspector that Lanay was poisoned at a different address before moving

Respondents also attacked Ms. Queen's credibility during the defense's case by reading into evidence excerpts from her deposition. Unfortunately, there were technical difficulties with the Circuit Court's recording system, resulting in a gap in the transcript of that stage of the trial. The parties stipulate on appeal that counsel for Respondents read portions of Ms. Queen's deposition and that Lanay objected, but her objection was overruled; however, the parties do not recall specifically what was actually read, nor the specific grounds, if any, argued by Lanay in her objection.

Counsel for Respondents also read Mr. Cavaliere's *de bene esse* deposition and offered into evidence the Un–Redacted ARC Report, which Mr. Cavaliere had identified; however, again, there is a gap in the transcribed record because of technical difficulties with the Circuit Court's recording system. The parties stipulate that Lanay objected when Respondents introduced the Un–Redacted ARC Report into evidence, but her objection was overruled. They also stipulate that Lanay argued that the Un–Redacted ARC Report was irrelevant because it described conditions of paint as they existed in 1999, while Respondents argued that the Un–Redacted ARC Report was admissible because Lanay's experts relied on it in forming their opinions. Neither party now claims that the trial court admitted the un-redacted report for any purpose other than that asserted by Respondents.

In his closing argument, Lanay's counsel attacked head-on the manner in which he anticipated that Respondents would use the Un–Redacted ARC Report. To that end, he stated:

Now, I want to talk to you about an exhibit that came into evidence.... And that's the report from Mr. Cavaliere. I have a feeling, can't guarantee it, but I have a feeling that [Respondents' counsel] is going to stand up in ... closing argument and say, "Look at the report from ARC Environmental. Yes, it has lead there, but look all the surfaces are [intact]." That's what I think [Respondents' counsel] is

to the Subject Property. Ms. Queen testified that she did not remember saying that.

going to say. And then he's going to say, "Well, it's [intact]. If it's [intact] it wasn't flaking. How is the landlord negligent and how is the landlord exposed?"

But I want you to remember this ladies and gentlemen because it is, for lack of a better word, a bogus argument and here is why. If you look at the first page of [the Un-Redacted ARC Report] the inspection was done on May 26, 1999. That's five years after Lanay moved out of the property. It's four years after Mr. Perlberg and Daniel Realty and Wendy Perlberg sold the property. Mr. Perlberg and Ms. Perlberg had never once stepped in to the property. Never inspected the property. Never saw the property. They have no idea what ... the new owner did to that property in terms of renovation and painting after they sold it in that four[-year] period from the time they sold it until the time it was tested.

Yes, this document shows lead in the property. As a matter of fact, if you can remember [Respondents' counsel's] opening statement, he admitted to you all that there was lead at [the Subject Property]. I don't think that fact is disputed. But don't let ... the defendants pull the wool over your eyes. The condition of the property in 1999 has nothing to do with the condition of the property between 1990 and 1994 when Lanay was living there.

Counsel for Respondents answered, making use of the Un-Redacted ARC Report (as anticipated) as well as Ms. Queen's deposition in his closing statement. He stated:

Ms. Queen testified there was chipping and peeling paint at the property, no doubt about it. But I ask you to think about when I read portions of her deposition she didn't remember if [her] father and mother lived there. In fact, she said in her deposition they didn't. She didn't remember the whole new wallpaper when I asked her. This was 17 years ago. But what did she say at the time when the Baltimore City Health Department was at the door in the home? She said, "No paint plaster[,] it wasn't noted." And she says, "The poisoning[,] the exposure occurred somewhere else." That's what she said at the time.

. . . .

There's no dispute here that at homes all through Baltimore City lead is at the bottom of the paint. No dispute about that. You've heard that from every witness, I told you that at opening. Every home . . ., where ever we are in this city there is a likelihood that there's lead in that home. No one contests that. And [Mr. Cavaliere] used a machine where he knew he would . . . find lead. And he told you that. He said, "There are machines I could have used which would tell you where it was in the paint, was it up near the surface." And he said, "I didn't do that. We don't use those machines in my (inaudible)."

But he said, "I could have." He admits I could have taken samples from the area and said, "I[s] this chip at the top [of] the paint[,] is that lead based paint?" And he said, "I didn't do that either." I don't dispute his results. He found lead in the home. What I dispute is, is that lead a hazard? If it's several layers down we know it's not a hazard, because every home or the tremendous majority of the homes in the city have that surface paint.

. . . .

This is the most important part. Here's the third inspection.[8] [Lanay's counsel] wants an inspection. We have three. His own people come to the [Subject Property], being hired by him, and they found the condition of the paint to be intact. Again, does it absolutely prove what condition the paint was in 1992? No. In and of itself it doesn't. It's a piece of evidence that you look at with these other pieces. But every piece of evidence we have shows this property to have intact paint. This is from an individual who again was looking at it from their point of view. He was the home town announcer on behalf of the plaintiff and they found it to be intact.

---

8. The first two inspections apparently were the 1990 inspection of the premises by Ms. Queen's parents when they signed the lease for the Subject Property and the 1992 inspection by the Baltimore City Health Department's Childhood Lead Poisoning Prevention Program.

Now paint typically doesn't get better as it ages and you can assess that when you're making the decision as well. Thirty-six of 38 areas were intact. And I'm going to show you the science results. Here's the third inspection. Look at the results, intact. The one condition here fair, and it's going to be tough to read, was the handrail and it was fair. Look over here, though. It's negative for lead. There was no lead in that area. That's a negative result.

Look at the walls, because we wallpapered these walls. Now the walls all tested negative. What they did is find wooded areas in the home that are going to test positive for lead. And told you any wooded surfaces in the home [are] going probably [to] test positive for lead. And so what he did is he tested the door casings, the windows, and he found positive results. Doesn't surprise anyone. What he didn't find is any chipping or peeling paint. And what he didn't find was any (inaudible) Lanay at that address. And he told you that.

Look at the next page of the report. Again, intact paint with one fair condition. Now ladies and gentlemen, this property was in good shape. This property was painted, maintained, papered; it looked good. Every piece of objective evidence shows us that.

After closing arguments, the trial judge submitted the case to the jury. The first issue for the jury to resolve, according to the verdict sheet, was whether there was chipping, peeling, or flaking at the Subject Property while Lanay lived there. The jury found in the negative and, accordingly, made no other findings of fact.[9] The Circuit Court entered judgment for Respondents in accordance with the jury's verdict. Lanay moved for a new trial, arguing that the court erred by allowing Respondents to use Ms. Queen's deposition against her and by allowing Respondents to introduce the Un–Redacted ARC Report. The Circuit Court denied the motion, and Lanay noted a timely appeal. The Court of Special Appeals

---

**9.** The verdict sheet instructed the jury to stop there, if it found in the negative on the first issue.

affirmed in a reported opinion. *Brown v. Daniel Realty Co.*, 180 Md.App. 102, 949 A.2d 6 (2008).

Specifically, the intermediate appellate court held that Respondents, in the defense's case-in-chief, were entitled to read excerpts from Ms. Queen's deposition pursuant to Rule 5–802.1,[10] which allows the use of a prior inconsistent statement, as substantive evidence, if the witness is subject to cross-examination concerning the statement. The court observed that, although she was no longer on the witness stand at the time, Ms. Queen was available to be re-called as a witness in rebuttal by Lanay following Respondents' counsel reading excerpts of the deposition. Thus, the court reasoned, Ms. Queen was subject to further cross-examination concerning her deposition testimony. To the extent that whatever Respondents' counsel read into the record was not inconsistent with Ms. Queen's trial testimony, the court concluded that Lanay was not prejudiced. Because it held the deposition excerpts admissible pursuant to its interpretation of Rule 5–802.1, the Court of Special Appeals expressly declined to resolve whether the fact that Ms. Queen's individual claims were no longer at issue rendered the deposition testimony otherwise inadmissible under Rule 2–419(a)(2)[11] or Rule 5–803(a),[12] which, respectively, permit the use for any purpose of

---

**10.** Rule 5–802.1 provides, in relevant part:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; ... or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement; ....

**11.** Rule 2–419(a)(2) provides, in relevant part:

... The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, managing agent, or a person designated under Rule 2–412(d) to testify on behalf of a public or private corporation, partnership, association, or governmental agency which is a party may be used by an adverse party for any purpose.

**12.** Rule 5–803 provides, in relevant part:

an adverse party's deposition and the prior statement of a party-opponent.

With respect to the Un–Redacted ARC Report, the intermediate appellate court held that the trial judge did not abuse her discretion in admitting it under Rule 5–703,[13] which permits the use of otherwise inadmissible evidence if relied on by an expert witness in her or his testimony. The court observed that Mr. Cavaliere and Dr. Paulson reviewed, and had opportunity to consider, the data in the Un–Redacted ARC Report in forming their respective opinions. Additionally, the court held that the un-redacted report was admissible as relevant evidence under Rule 5–401[11] to the extent that it showed that the ARC testing could produce a positive reading for lead, even if the paint was intact, and that the existence of lead does not mean necessarily that the paint was peeling, chipping, or

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(a) Statement by party-opponent. A statement that is offered against a party and is:

(1) The party's own statement, in either individual or representative capacity;

(2) A statement of which the party has manifested an adoption or belief in its truth;

(3) A statement by a person authorized by the party to make a statement concerning the subject;

(4) A statement by the party's agent or employee made during the agency or employment relationship concerning a matter within the scope of the agency or employment; . . . .

13. Rule 5–703 provides in relevant part:

(b) **Disclosure to jury.** If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert . . . may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

14. Rule 5–401 provides:

**Definition of "relevant evidence".**

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

flaking.[15]

Lanay, Petitioner, filed with this Court a Petition for a Writ of Certiorari, which we granted. *Brown v. Daniel Realty,* 405 Md. 505, 954 A.2d 467 (2008). The petition essentially posed two questions: (1) Whether the Court of Special Appeals erred in holding that the Circuit Court properly allowed counsel for Respondents to read into evidence, during the defense's case-in-chief, excerpts from Ms. Queen's deposition testimony?[16]; and, (2) Whether the Court of Special Appeals

---

**15.** Lanay also argued that the trial judge erred by allowing Respondents to read into evidence the *de bene esse* deposition of Mr. Cavaliere; however, she does not press that issue before this Court.

**16.** With the benefit of full briefing, oral argument, and review of the record, we find the certiorari question, as phrased by Petitioner in her petition, to be a bit misleading. She petitioned us to decide:

> If a witness was a party to a case at the time the witness'[s] deposition was obtained, but not a party at the time of trial, is it proper for a trial court to permit a party to read portions of that deposition into evidence pursuant to Maryland Rule 2–419(a)(2)[,] even though the witness is no longer a party to the case and not unavailable.

The question, as articulated by Petitioner, is inaccurate as a matter of fact in that Ms. Queen indisputably was a party in her own right for at least a portion of the trial; it was not until the end of her and Petitioner's case-in-chief that her individual claims ceased to occupy the trial attention of the judge and jury. A more substantive problem is that the intermediate appellate court did not decide whether Rule 2–419(a)(2) allows a litigant to use the deposition of a former adverse party after the latter ceases to be a party to the case. The Court of Special Appeals wrote:

> We need not resolve the interesting issues raised by the parties regarding the legal status of a next friend or the use of a deposition of a witness who was previously a party but is no longer a party to the case. In our view, the circuit court did not err by permitting appellees to read into evidence relevant portions of Ms. Queen's deposition, even though she was no longer pressing her individual claims against appellees by that point in the trial proceedings, because (1) the inconsistent deposition testimony was admissible as substantive evidence under Rule 5–802.1[ ], and (2) to the extent that the deposition testimony was not inconsistent with the trial testimony, its admission was harmless error.

*Brown v. Daniel Realty Co.,* 180 Md.App. at 121–22, 949 A.2d at 18. Petitioner contends that Respondents never argued Rule 5–802.1 as a basis for admitting the deposition testimony of Ms. Queen as substantive evidence and that Rule 5–802.1 did not factor into the trial court's

erred in holding that the Circuit Court properly allowed Respondents to introduce the Un–Redacted ARC Report? For the reasons that follow, we affirm the judgment of the intermediate appellate court.

## Standard of Review

It often is said that a trial court's ruling on the admissibility of evidence is reviewed pursuant to the "abuse of discretion" standard. *Matthews v. Md.-Nat'l Capital Park & Planning Comm'n,* 368 Md. 71, 91, 792 A.2d 288, 300 (2002); *see also Figgins v. Cochrane,* 403 Md. 392, 419, 942 A.2d 736, 752 (2008). Such rulings, it is maintained, are "left to the sound discretion of the trial court" and will not be reversed on appeal "absent a showing of abuse of that discretion." *Matthews,* 368 Md. at 91, 792 A.2d at 300 (quoting *Farley v. Allstate Ins. Co.,* 355 Md. 34, 42, 733 A.2d 1014, 1018 (1999)). We have stated, however, that:

> Application of [the abuse of discretion] standard [ ] depends on whether the trial judge's ruling under review was based on a discretionary weighing of relevance in relation to other factors or on a pure conclusion of law. When the trial judge's ruling involves a weighing, we apply the more deferential standard. On the other hand, when the trial judge's ruling involves a legal question, we review the trial court's ruling *de novo.*

*Figgins,* 403 Md. at 419, 942 A.2d at 752 (emphasis omitted) (quoting *Hall v. Univ. of Md. Med. Sys. Corp.,* 398 Md. 67, 82–83, 919 A.2d 1177, 1186 (2007)); *Matthews,* 368 Md. at 92, 792 A.2d at 300.

---

decision. In light of the peculiar problems with the transcript from the trial, we are inclined to overlook the technical issues and strict confines of Petitioner's first question. We note, however, that answering Petitioner's question in the negative would require necessarily that we decide the correctness of the intermediate appellate court's reported decision regarding Rule 5–802.1, even though Petitioner did not ask this Court expressly to address that in her Petition for a Writ of Certiorari.

Additionally, Maryland Rule 5–103 provides, in pertinent part:

(a) **Effect of erroneous ruling.** Error may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling. . . .

 Thus, even if "manifestly wrong," we will not disturb an evidentiary ruling by a trial court if the error was harmless. *Crane v. Dunn,* 382 Md. 83, 91–92, 854 A.2d 1180, 1185 (2004). The party maintaining that error occurred has the burden of showing that the error complained of "likely . . . affected the verdict below." *Id.* "It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry. Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice." *Flores v. Bell,* 398 Md. 27, 34, 919 A.2d 716, 720 (2007) (quoting *Crane,* 382 Md. at 91–92, 854 A.2d at 1185).

## Analysis

### I. Ms. Queen's Deposition.

Petitioner urges that the Circuit Court committed reversible error in permitting Respondents to read into the record excerpts from Ms. Queen's deposition testimony as substantive evidence in the defense's case. As noted earlier, there is a gap in the transcribed record of this case at a point pertinent to this issue. The parties, however, stipulate that Petitioner objected and that Respondents proffered that Ms. Queen was a party for purposes of Rule 2–419(a)(2), thus allowing them to use her deposition "for any purpose." The parties also stipulate that Petitioner argued that Ms. Queen ceased to be a party when her individual claims were disposed of in Respondents' favor at the close of her and Petitioner's case-in-chief, but that Petitioner's objection was overruled.

 Before considering the directives of Maryland Rule 2–419(a)(2), we reiterate that, when interpreting the Maryland Rules, we ordinarily employ the rules of statutory construc-

tion. *Hurst v. State,* 400 Md. 397, 417, 929 A.2d 157, 168 (2007). A cardinal principle in that regard states that if the language of a rule is clear and unambiguous, it will be applied thusly in a common-sense manner. *Id.* Maryland Rule 2–419 provides, in pertinent part:

**Deposition–Use.**

**(a) When may be used.**

. . . .

(2) The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, managing agent, or a person designated under Rule 2–412(d) to testify on behalf of a public or private corporation, partnership, association, or governmental agency which is a party may be used by an adverse party for any purpose.

Petitioner maintains that Rule 2–419(a)(2) does not provide Respondents with an evidentiary basis for using Ms. Queen's deposition as substantive evidence in their defense case because, so she asserts, Ms. Queen ceased to be a "party," as required by the rule, when her individual claims were disposed of in Respondents' favor before the defense's case commenced. Respondents have two responses. Initially, they posit that determination of a deponent's status as a "party" for purposes of Rule 2–419(a)(2) reckons back to the time that her or his deposition was taken, not the time of the deposition's use as evidence. Thus, according to them, because Ms. Queen was a party in her own right at the time of her deposition, they were entitled to use that deposition "for any purpose" at trial. Alternatively, Respondents assert that, even when they offered Ms. Queen's deposition as evidence in their defense case, Ms. Queen was a "party" due to her continuing status as Petitioner's next friend. We shall discuss each of Respondents' contentions in turn.

■ This Court has not had an opportunity previously to consider whether Rule 2–419(a)(2) permits a litigant to use "for any purpose" the deposition of a person who was a party in the same case at the time of the deposition, but ceased to be

a party by the time the deposition was offered into evidence [17]; however, the wording of the Rule, which we presume to be deliberate, directs our answer. Rule 2–419(a)(2) covers two types of depositions: (1) those of natural persons who are parties, and (2) those of representatives of institutions that are parties. With respect to both, the Rule speaks in the present tense, allowing that either "may be used by an adverse party for any purpose." With respect to the depositions of representatives of institutions, however, the Rule explicitly recognizes that a deponent's capacity as a representative of the institutional party may change between the taking of the deposition and the trial, without affecting the right of the institution's opponent to use the deposition against the institution for any purpose. Rule 2–419(a)(2) makes no similar provision for allowing a litigant to use for any purpose the deposition of a former party (either as a natural person or as an institution testifying through a representative) whose status *as a party* changed between the deposition and the time that the litigant attempts to use the deposition at trial. Therefore, for an adverse party to use a party deponent's deposition for any purpose under Rule 2–419(a)(2), the deponent (or the institution that the deponent represented) must be a party when the deposition is offered into evidence.

In this regard, we agree with the reasoning of the Court of Appeals of Colorado, which interpreted that state's equivalent to Maryland Rule 2–419(a)(2) and, likewise, concluded that the time that a deposition (or a part thereof) is offered into evidence constitutes the relevant point for determining the status of the deponent (or the institution speaking through the deponent) for purposes of the rule's applicability:

> This conclusion is supported by the language of the rule. The rule, in essence, states that the deposition of a party who is a natural person, or a person who was at the time of the deposition testifying as an agent or representative of an entity *which is a party*, may be used by an adverse party

---

**17.** Nor do Petitioner or Respondents direct us to any decisions by any other state supreme courts, for that matter, interpreting a similarly worded rule of procedure.

for any purpose. The rule speaks in the present tense as to both circumstances, but recognizes the status of a deponent as to an entity may change between the deposition and trial. *Rojhani v. Meagher,* 22 P.3d 554, 560 (Colo.Ct.App.2000) (italics in original).[18]

Our conclusion is echoed by other states' intermediate appellate courts as well. *See Skok v. City of Glendale,* 3 Ariz.App. 254, 413 P.2d 585, 588 (1966) ("We therefore hold that as to the deposition of a party as distinguished from an 'officer, director, or managing agent of a ... corporation, partnership, or association which is a party[,]' its admissibility and use by any adverse party 'for any purpose' is to be determined by the facts which appear at the time the deposition is offered in evidence and not necessarily as they existed at the time the deposition was taken." (citation omitted))[19]; *Vivion v. Nat'l Cash Register Co.,* 200 Cal.App.2d 597, 19

---

**18.** Rule 32 of the Colorado Rules of Civil Procedure provides, in pertinent part:

(a) Use of Depositions. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

. . . .

(2) The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent of a public or private corporation, partnership, or association, or a governmental agency, which is a party, or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf thereof may be used by an adverse party for any purpose.

CoLo R. Civ. P. 32 (LexisNexis 2009). The relevant provisions of Rule 32 were the same when the court decided *Rojhani. See* 22 P.3d at 559.

**19.** Currently, Rule 32 of the Arizona Rules of Civil Procedure provides, "[a]t the trial ..., any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party ...." ARIZ R. CIV P. 32(a) (LexisNexis 2009). The notes to the rule provide that the rule reads the way it does to make clear that "it is the status of the matter at trial which is controlling," in accordance with *Skok.* In any event, when the Arizona intermediate appellate court decided *Skok,* the relevant rule of procedure was similar to Maryland Rule 2-419(a)(2), providing:

USE OF DEPOSITIONS

Cal.Rptr. 602, 608 (1962) ("With respect to the witness . . ., the action having been dismissed against her, she was no longer a party to the record Under these circumstances, she does not come within the categories mentioned in the Code of Civil Procedure, . . . [which] permits the depositions of persons who come within the categories enumerated to be used by an adverse party for any purpose."); *State Univ. Constr. Fund v. Kipphut & Neuman Co.*, 159 A.D.2d 1003, 552 N.Y.S.2d 471, 473 (1990) ("The language of the statute refers to two points in time. With respect to the deponent's status as an officer, director, agent or employee of a party, it refers to the time of taking of the deposition. With respect, however, to the 'use' of the deposition by 'any adversely interested party', the language refers back to 'at the trial'.").[20]

Respondents rely on *Iheme v. Simmons*, 148 Misc.2d 223, 560 N.Y.S.2d 167 (N.Y.Civ.Ct.1990), for the counter-proposi-

---

At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof, in accordance with any one of the following provisions:
. . . .
2. The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent of a public or private corporation, partnership, or association which is a party may be used by an adverse party for any purpose.
*Skok*, 413 P.2d at 587.

**20.** Petitioner properly points out that New York since has changed its rule's language to permit "any party who was adversely interested when the deposition testimony was given" to use for any purpose "the deposition testimony . . . of any person who was a party when the testimony was given." N.Y.C.P.L.R. 3117(a) (LexisNexis 2009). When *State Univ. Constr. Fund* was decided, however, the rule was similar to Maryland Rule 2–419(a)(2), providing:
(a) . . . [a]t the time of trial . . . any part or all of a deposition, so far as admissible under the rules of evidence, may be used in accordance with any of the following provisions . . .
2. the deposition of a party or of any one who at the time of taking the deposition was an officer, director, member, or managing or authorized agent of a party, or the deposition of an employee of a party produced by that party may be used for any purpose by any adversely interested party.
552 N.Y.S.2d at 473.

tion that a person's status as a "party," for purposes of a rule detailing the use of a deposition for any purpose, is determined by looking backward in time to the deponent's status at the time the deposition was given. Respondents point out that *Iheme* was decided under a rule substantially similar to Rule 2–419(a)(2), before New York changed its rule on the use of depositions to permit expressly the use for any purpose of a deposition of a former party.[21] We are not persuaded by *Iheme's* conclusion. It is inconsistent with the plain language of Maryland Rule 2–419(a)(2), which speaks in the present tense. Additionally, *Iheme* is a trial court decision and is against the weight of other well-reasoned, persuasive authority, including other cases decided by New York courts. *See State Univ. Constr. Fund,* 552 N.Y.S.2d at 473; *Nedball v. Tellefsen,* 102 Misc.2d 589, 424 N.Y.S.2d 93, 95 (N.Y.Sup.Ct. 1980).

Respondents retort that, even at the time they offered into evidence Ms. Queen's deposition testimony, Ms. Queen was a "party" for purposes of Rule 2–419(a)(2), regardless of the resolution of her individual claims. This is so, Respondents urge, because Ms. Queen, at all times, was acting also as Petitioner's next friend, rendering her, for all intents and purposes, a "party." Petitioner, however, contends that under Maryland law, a next friend is not a party.

A "next friend," or *"prochein ami,"* is "one who brings suit on behalf of a minor or disabled person because the minor or disabled person lacks capacity to sue in his or her own right, or . . . one who defends a suit against a minor or disabled person lacking the capacity to defend." *Fox v. Wills,* 390 Md. 620, 625–26, 890 A.2d 726, 729 (2006).[22] We have stated that a next friend " 'stands very much in the relation of

---

21. *See supra* note 20.

22. We also observed, in *Fox,* that the term "guardian *ad litem,*" at times, has been employed by this Court and the General Assembly synonymously with the terms "next friend" and *"prochein ami."* 390 Md. at 625, 890 A.2d at 729. For present analytical purposes, we shall treat all three terms as having the same meaning.

an attorney to the case, and [ ] it is supposed that he is appointed by the court.'" *Berrain v. Katzen,* 331 Md. 693, 703, 629 A.2d 707, 712 (1993) (quoting *Deford v. State, Use of Keyser,* 30 Md. 179, 199 (1869)); *see also Fox,* 390 Md. at 629, 890 A.2d at 731 (noting same). Furthermore, we recognize that "'the trial court has a special duty to protect the rights and interests of the minor plaintiff who is represented by [a] next friend to insure that the next friend does not prejudice those rights and interests through conflict of interest, fraud, or ... neglect.'" *Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 435, 914 A.2d 113, 131 (2007) (quoting *Berrain,* 331 Md. at 706, 629 A.2d at 715–16). Decisions of this Court generally recognize a distinction between infant litigants and their next friends.

More than a century and a half ago, this Court, considering whether an infant that was a defendant in an action should be bound by his next friend's answer to a plaintiff's bill of complaint, iterated:

Regularly an infant's answer by his guardian is not evidence against him, because he is not sworn, and it is only for the purpose of making proper parties. It is not in reality the answer of the infant, but of the guardian only who is sworn; and there is great danger to the interests of an infant, in permitting such an answer to be read against him, who from his tender years, may know nothing of the contents of the answer put in for him by his guardian, or not be able to judge of it, or of its effect. And the guardian *ad litem* is so appointed, as often to know nothing of the matter himself; and too much caution cannot well be observed, in guarding the rights of infants, not only against the improvident answers of honest guardians, but against the answers of such as may have sinister views; to say nothing of how far an infant may ordinarily be bound by a decree, upon an answer by his guardian, admitting the facts of the bill.

The better and safer course, therefore, for all concerned, is in every case, in which an infant is a defendant, answering by his guardian, to put the plaintiff upon the proof of the material allegations in his bill, in the same manner, as if

nothing had been admitted by the answer, unless otherwise expressly provided by law. It is the proper course, and that which prevails elsewhere.

*Kent's Adm'rs v. Taneyhill,* 6 G. & J. 1, 3 (Md.1833).

Almost a century later, this Court pondered, in *Pindell v. Rubenstein,* whether a minor plaintiff was bound by the hearsay admissions of his next friend. 139 Md. 567, 575, 115 A. 859, 862 (1921). There, the minor plaintiff, through his mother as his next friend, sued the defendants alleging that their wooden gate fell on him while he walked past it on his way to the store, breaking one of his legs. At trial, the mother testified on direct examination that she sent the minor plaintiff to the store with her sister, the minor's aunt, and that she knew nothing of the accident until her sister brought the injured child home. *Id.* at 572, 115 A. at 861. The defendants sought to introduce evidence that the mother visited one of the defendants shortly after the accident and told that defendant that it was the minor's fault that he was hurt, and not the defendants' fault. The defendants proffered further that the mother said she did not see the accident, but learned from the minor's aunt, who was with the minor at the time of the accident, that he was climbing on the gate before it fell on him. *Id.* at 575, 115 A. at 862. In holding that the admission by the minor plaintiff's mother was not admissible, we opined:

[The minor plaintiff's mother] had positively disclaimed any knowledge of the accident or the instrumentality which caused it. Anything which she may have said therefore as to it was necessarily hearsay, irrelevant and collateral to any issue involved in this case. *She was in no sense a party to the cause within the meaning of the rule permitting evidence to be given of admissions against interest made by a party, and her admissions were not competent to affect the interest of the infant whom she represented.*

*Id.* (italics added).

While this Court has not revisited recently the issue of whether a next friend is a "party," we have reaffirmed, in other contexts, the distinctions recognized between a next

friend and an infant litigant. In *Berrain v. Katzen*, we held that it was an abuse of discretion for a trial court to enter a default judgment against minor plaintiffs as a sanction for the failure of the plaintiffs' next friend to comply with the reasonable discovery requests of the defendants. 331 Md. at 706, 629 A.2d at 715–16. There, the plaintiffs were three minor siblings who suffered permanent brain damage, allegedly from exposure to lead-based paint. *Id.* at 695, 629 A.2d at 707. Through their mother as their next friend, the children initiated an action against their landlord; however, the case was dismissed without prejudice, due to a lack of prosecution. *Id.* Two years later, the children, again through their mother as next friend, filed a new suit against the same landlord. *Id.* at 696, 629 A.2d at 707. The defendant landlord propounded interrogatories to the plaintiff children through their mother, and, after waiting more than seven months for a response, sought sanctions against the plaintiffs. *Id.* at 697, 629 A.2d at 707–08. Finding it to be the appropriate sanction under the circumstances, the trial court dismissed the plaintiff children's action with prejudice and denied their motion for reconsideration. *Id.* In reversing the trial court,[23] we observed that "[h]ad the plaintiffs ... been adults, the record and our decisions would clearly support ... the trial court's dismissal with prejudice"; however, "where neglect ... lies with the next friend, an officer of the court, not the minor plaintiffs," the harshest of discovery sanctions was not warranted. *Id.* at 710–11, 629 A.2d at 715–16. We suggested instead that the trial court should have replaced the next friend with someone willing to represent diligently the plaintiffs' interests or, if no such person was available, dismiss the plaintiffs' action without prejudice so that they could pursue their claims upon reaching the age of majority. *Id.* at 711, 629 A.2d at 716.

In *Fulton v. K & M Assocs.*, another lead paint case, we held that it was abuse of discretion for a trial court to decline to dismiss without prejudice the suit of a minor plaintiff,

---

23. We granted certiorari before arguments were heard in the Court of Special Appeals. *Berrain v. Katzen*, 329 Md. 337, 619 A.2d 547 (1993).

where the next friend, the minor plaintiff's mother, did not cooperate with counsel's endeavors to have the minor plaintiff examined by a medical expert. 331 Md. 712, 713–14, 629 A.2d 716, 717 (1993). There, counsel for the minor plaintiff informed the trial court, on the day of trial, that he was not prepared to proceed, citing the lack of cooperation on the part of the minor plaintiff's mother in taking the child for psychometric testing to determine whether his disabilities were consistent with lead poisoning. *Id.* at 714, 629 A.2d at 717. Counsel for the minor plaintiff accordingly moved for a voluntary dismissal in order to preserve the cause of action. The trial court denied the motion, and the minor plaintiff proceeded with his case without expert medical testimony. After the plaintiff's case-in-chief, the court granted the defendants' motion for judgment. *Id.* at 714–15, 629 A.2d at 719. "Based on the same reasoning which supported our decision in *Berrain*," we reversed the trial court's decision not to grant the motion for a dismissal without prejudice. *Id.* at 717, 629 A.2d at 719.[24] We observed that the apparent negligence on the part of the next friend should have prompted the trial court to "intervene[ ] on behalf of the minor plaintiff." *Id.* at 718, 629 A.2d at 719.

*Berrain* and *Fulton* are reconcilable with other cases in which we have declined to enforce rigidly the status of a next friend as separate and distinct from that of the infant litigant whom the next friend represents. In *Allers v. Leitch,* we held that the testimony of a next friend is subject to the same limitations under the "dead man's statute"[25] as would be the

---

**24.** We granted certiorari before the Court of Special Appeals considered the case. *Fulton v. K & M Assocs.,* 329 Md. 479, 620 A.2d 349 (1993).

**25.** Currently, the "dead man's statute" is codified at Maryland Code (2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 9–116 and provides:

A party to a proceeding by or against a personal representative, heir, devisee, distributee, or legatee as such, in which a judgment or decree may be rendered for or against them, or by or against an incompetent person, may not testify concerning any transaction with

testimony of a minor plaintiff 213 Md. 390, 392, 131 A.2d 458, 459 (1956). Accordingly, the next friend of a minor plaintiff, in a suit against the estate of a decedent, was not competent to testify concerning a transaction with the decedent. *Id.; see also Snyder v. Crabbs,* 263 Md. 28, 30–31, 282 A.2d 6, 8 (1971).

More recently, in *Aventis Pasteur, Inc. v. Skevofilax,* we held that it was not an abuse of discretion for a trial court to deny a motion by a minor plaintiff, through his parents as next friends, to dismiss his claims without prejudice in order to preserve his cause of action, where there was no evidence of fraud, conflict of interest, or neglect on the part of his next friends. 396 Md. at 435–36, 914 A.2d at 131. In *Skevofilax,* the minor plaintiff, through his next friends, designated a medical expert for the purpose of rendering an expert opinion as to whether the minor plaintiff's autism spectrum disorder was caused by a mercury preservative in the defendants' pediatric vaccines; however, after the trial court entered several revised scheduling orders due to the expert's inability to compile the data necessary for him to provide an opinion on causation, the expert finally declined to participate in the litigation, assertedly, because of other commitments. *Id.* at 413–14, 914 A.2d at 118–19. When it became clear that the sole causation expert designated by the plaintiff would not be available, counsel for the defendants moved for summary judgment. Counsel for the minor plaintiff moved for a dismissal without prejudice. The trial court denied the motion to dismiss without prejudice, citing "the significant time and money that had been expended in preparing pleadings and preliminary motions, and the conduct of extensive discovery," and awarded summary judgment to the defendants due to the lack of expert testimony on causation. *Id.* at 415, 914 A.2d at 119. The Court of Special Appeals reversed, relying on this Court's decisions in *Berrain* and *Fulton;* however, we re-

---

or statement made by the dead or incompetent person, personally or through an agent since dead, unless called to testify by the opposite party, or unless the testimony of the dead or incompetent person has been given already in evidence in the same proceeding concerning the same transaction or statement.

versed the intermediate appellate court. *Id.* at 416, 914 A.2d at 120. We reasoned that "absent conflict of interest, fraud, or neglect by a parent, guardian, next friend, or the minor's attorney, a motion for voluntary dismissal made on behalf of a minor should not be analyzed differently than a motion for dismissal without prejudice filed by any plaintiff." *Id.* at 436, 914 A.2d at 131.

 From the foregoing cases, we glean that a child who, due to her or his infancy, must rely on a next friend during litigation should not be subjected to an interpretation of the rules of evidence and discovery that effectively would penalize her or him for prosecuting or defending a cause through a next friend; conversely, in the interests of justice and fairness to the opponents of infant litigants, a child should not be permitted to evade, by prosecuting or defending a cause through a next friend, application of the rules of evidence and discovery. In the present case, we resolve that the trial judge erred by allowing Respondents to read into evidence during their defense case the deposition testimony of Ms. Queen. As stated, Rule 2–419(a)(2) mandates that the deposition be of someone who is a party at the time the deposition is offered into evidence. As Petitioner's next friend, Ms. Queen was not a "party" when Respondents offered her deposition into evidence. *See Pindell,* 139 Md. at 575, 115 A. at 862. The present case is not one, like *Skevofilax,* in which Petitioner evades application of the rules of evidence or discovery because of her infancy.

 Nevertheless, we will not reverse a judgment if the trial court's error was harmless. *Crane,* 382 Md. at 91–92, 854 A.2d at 1185. A successful proponent of error ordinarily has the additional burden of showing that the error complained of probably, as opposed to possibly, influenced the unfavorable verdict. *Id.* Here, Petitioner is not able to carry the day. She complains that she "was particularly prejudiced by the trial court's ruling because [Ms. Queen's] credibility was obviously an issue." She does not articulate any harm to her cause other than that the deposition testimony undermined

Ms. Queen's credibility. She directs our attention to a portion of the closing argument of Respondents' counsel in which he said to the jury, "I ask you to think about when I read portions of [Ms. Queen's] deposition and she didn't remember anything about the house. She didn't remember if [her] father and mother lived there. In fact she said in her deposition they didn't." Petitioner contends that Respondents "should not have been able to impeach [Ms. Queen's] credibility after their counsel already had the chance to cross-examine her." She claims that they "took advantage of the trial court's error by emphasizing the 'read-in' portions of the deposition in closing argument."

The flaw with Petitioner's contention is that, when Respondents' counsel read into evidence the deposition testimony of Ms. Queen during the defense's case, Respondents had used the deposition previously to impeach Ms. Queen during their cross-examination of her during Petitioner's case-in-chief. In other words, the damaging features of Ms. Queen's deposition testimony (to which Petitioner directs us) already were before the jury, regardless of Respondents' potentially duplicative use of the deposition during their defense case. Petitioner, however, does not complain here about Respondents' use of Ms. Queen's deposition during their cross-examination of her; nor does it appear from the record (which is intact for this part of the trial) that Petitioner objected to its use at that time. The following exchange from the cross-examination of Ms. Queen is pertinent:

[Respondents' counsel:] Now, first of all you were talking about your step-father, Mr. Brown, living with you [at the Subject Property?]

[Ms. Queen]: Yes.

Q Do you recall telling me in deposition ... that Mr. Brown didn't live at [the Subject Property]?

A He lived there but he just wasn't being there. He lived there. That was his residence. He lived there. Yes, he lived there. I don't recall.

. . . .

Q Do you recall pointing out to us in deposition that Mr. Brown ... had his own apartment somewhere?

A No.

Q Okay. Did Mr. Brown live at [the Subject Property]?

A Yes.

Q Okay. Let me refer you to—and I'll give you a copy of your deposition—page thirty-three. I'm going to hand it to you, if you don't mind. There it is. There is page thirty-three.

. . . .

A Well I said it.

. . . .

Q ... On page thirty-three, you were asked: "You don't know if your father lived with you at [the Subject Property]?"

. . . .

Answer: "I wasn't—no, I am not sure. He lived there but he didn't come there. So I say no."

Question: "He lived there but he didn't come there?"

Answer: "He paid everything, paid the bills. It is their house but they don't stay there."

Question: "We are referring to Robert Brown?"

Answer: "Yes."

A Yes.

Q So do you recall testifying that Mr. Brown, in fact, didn't live at [the Subject Property]?

A I said—you said I said he lived there but he don't stay there. Yes.

Q Okay. Now, when you said in this testimony that they didn't live there, that they didn't stay there—

A My mother stayed there.

. . . .

Q Now, when you said in your sworn deposition testimony that they didn't stay there, were you referring to the fact that your parents didn't live there at times?

A No.

Q For instance, you just told us that there were four bedrooms and they were all occupied with others.

A And I said they stay down in the basement. I know what I said.

Q So your parents stayed in the unfinished basement?

A I said they decorated it theirself. That's what I said.

[Trial Judge]: But the question is, did they stay in the basement?

A I said yes.

[Respondents' counsel]: And that basement was unfinished?

A I said they decorated it theirself but it was unfinished at first.

Q Did Robert Brown stay with you the entire time you were at [the Subject Property]?

. . . .

A No. No is the best way to answer you.

Petitioner does not explain how the impeachment value of Respondents' use of Ms. Queen's deposition during the defense's case-in-chief, which Petitioner objected to and continues to protest, differed in substance or effect from the use of the deposition during the foregoing dialogue, which engendered no protest from Petitioner. In fact, as the foregoing dialogue reveals, counsel for Respondents read an excerpt from the deposition during his cross-examination of Ms. Queen. That excerpt concerned whether Ms. Queen's mother and step-father lived at the Subject Property, and it is the relevant portion of the deposition testimony that he referenced in his closing argument to the jury. Counsel for Respondents also iterated in his closing argument that Ms. Queen did not recall new wallpaper at the Subject Property; however, that point was developed as well during cross-examination, regardless of whether it came out again when he read the deposition during Respondents' defense case.

Petitioner asserts that the excerpts read into evidence during Respondents' defense case also might have included

some statements in which Ms. Queen admitted that Respondents occasionally sent people to the Subject Property to make repairs, a point Petitioner believes prejudices her by undermining the believability of Ms. Queen. If, however, counsel for Respondents in fact read into evidence this part of the deposition, the prejudice to Petitioner was not sufficient to warrant reversing the jury's verdict in this case. First, Ms. Queen acknowledged during her direct examination that Respondents sent people to the Subject Property to make repairs, testifying that Daniel Realty "patched the hallway up and had some men on the roof." Second, it is not apparent how the fact that Respondent sent repairmen to the Subject Property, if believed, likely influenced the jury to conclude erroneously that the Subject Property *did not* contain chipping or peeling paint, lead-based or otherwise.

Accordingly, the trial judge's error in allowing Respondents, under Rule 2–419(a)(2), to read into evidence excerpts from Ms. Queen's deposition testimony during their defense case was harmless on the record as presented to us. Because we conclude as such, we do not reach the issue of whether the deposition testimony alternatively was admissible under Maryland Rule 5–802.1, as so resolved by the intermediate appellate court. At least according to the parties' stipulations, Rule 5–802.1 was not relied upon by the Circuit Court in allowing use of the deposition.[26]

---

**26.** In passing, we observe that Rule 2–419(a)(2) is a rule of discovery. Accordingly, a deposition that satisfies the dictates of use under the rule nonetheless would not be admissible in a trial if otherwise barred by a rule of evidence. Conversely, where, as here, a deposition is of a witness who is not a "party" under Rule 2–419(a)(2), such a deposition in certain circumstances might be admissible at trial as a vicarious admission of a party under Rule 5–803(a)(2)–(5). Respondents argue in their brief that Ms. Queen's deposition testimony constituted a vicarious admission by Petitioner. They urge that (a)(2)-(4) is applicable here, asserting that Petitioner "manifested an adoption or belief in its truth"; that Ms. Queen was "authorized by [Petitioner] to make a statement concerning the subject"; and that Ms. Queen was Petitioner's agent and gave her deposition "during the agency ... concerning a matter within the scope of the agency."

## II. The Un–Redacted ARC Report.

▮▮▮ Petitioner next contends that the Circuit Court committed reversible error by allowing Respondents to offer as evidence the Un–Redacted ARC Report. She maintains that it was irrelevant because it detailed the condition of the Subject Property five years after she and Ms. Queen moved out. She asserts that she was prejudiced by this evidence because it described the paint at the Subject Property, for the most part, as "intact." Respondents, however, rejoin that Petitioner's experts reasonably relied upon the un-redacted report in forming their opinions, therefore rendering it admissible under Maryland Rule 5–703.

Maryland Rule 5–703 provides, in pertinent part:

(a) **In general.** The facts and data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(b) **Disclosure to the jury.** If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts and data reasonably relied upon by an expert pursuant to section (a) may, in the discretion of the court be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating

---

There are two reasons why we decline the invitation to address Respondents' argument. First, as stated, any error in allowing them to read Ms. Queen's deposition into evidence during their defense case was, in any event, harmless. Second, the lack of a complete transcript precludes this Court from reviewing the trial court's factual determination that Ms. Queen's deposition testimony was the vicarious admission of Petitioner, assuming the trial court even made such a determination. *See* Maryland Rule 5–803(a), cmt. n. ("Where there is a disputed issue as to … representative capacity, authorization to make a statement, … or any other foundational requirement, the court must make a finding on that issue before the statement may be admitted.").

the validity and probative value of the expert's opinion or inference.

■■■ Thus, four elements must be satisfied for a document to be admissible under this rule. The document must be (1) trustworthy, (2) unprivileged, (3) reasonably relied upon by an expert in forming her or his opinion, and (4) necessary to illuminate that expert's testimony.

In the present case, Petitioner does not argue that the Un–Redacted ARC Report was privileged or untrustworthy. Instead, she asserts that it was neither relied upon by her experts, Dr. Paulson and Mr. Cavaliere, nor necessary to illuminate their testimonies. Petitioner contends that the trial judge abused her discretion in concluding otherwise because, so she claims, Mr. Cavaliere testified (in deposition) only that paint on the Subject Property contained lead and Dr. Paulson testified (in trial) only that Petitioner was poisoned there by ingestion of lead. We disagree.

■■■ " '[T]he admissibility of evidence, including rulings on its relevance, is left to the sound discretion of the trial court, and absent a showing of abuse of that discretion, its rulings will not be disturbed on appeal.' " *Dehn v. Edgecombe,* 384 Md. 606, 628, 865 A.2d 603, 616 (2005) (quoting *Farley v. Allstate Ins. Co.,* 355 Md. 34, 42, 733 A.2d 1014, 1018 (1999)). An abuse of discretion lies where no reasonable person would share the view taken by the trial judge. *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312, 701 A.2d 110, 118 (1997). Recently, this Court observed:

> "[A] ruling reviewed under the abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable."

*King v. State,* 407 Md. 682, 697, 967 A.2d 790, 799 (2009) (quoting *North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025, 1031–32(1994)). In the instant case, we cannot conclude that the trial judge's ruling was so far removed from the center

mark that no reasonable person could have taken the same view.

First, the trial judge did not abuse her discretion in determining that Petitioner's experts relied on the Un–Redacted ARC Report. As Petitioner's counsel laid the foundation for Dr. Paulson's opinion, it was patent that Dr. Paulson relied on the Un–Redacted ARC Report. Indeed, when Petitioner's counsel presented Dr. Paulson with the Redacted Version, he asked, "Can you tell me [if] that's a fair and accurate *yet redacted copy of the report that you relied upon* to determine that there was lead paint at [the Subject Property]?" (italics added). Dr. Paulson testified that it was. Additionally, Mr. Cavaliere testified in his *de bene esse* deposition that he formed his opinion that the Subject Property contained lead-based paint by reviewing the Un–Redacted ARC Report, which his technicians prepared.

Second, the trial judge did not abuse her discretion in concluding that the Un–Redacted ARC Report was necessary to illuminate the testimonies of Petitioner's experts. In testifying to his expert opinion that Petitioner was poisoned by lead at the Subject Property, Dr. Paulson referred to the report generated by ARC, which, as we observed, apparently was the Un–Redacted ARC Report. He stated, "we have documentation from an inspection done of the home at that address that there was lead paint *on the surface, on multiple surfaces* at that address. Lead-based paint was found at over 20 sites at that address when the home was inspected in May of 1999." (italics added). The Un–Redacted ARC Report clarified that the detection of lead-based paint at a particular location does not mean necessarily that the paint is peeling or chipping. It also undermined the connection asserted by Dr. Paulson between "lead paint on . . . multiple surfaces" of the Subject Property and Petitioner's poisoning by clarifying that, in the report cited by Dr. Paulson, the paint on the surfaces was actually intact.

Petitioner counters that Dr. Paulson's reference to lead-based paint on the "surfaces" of the Subject Property is taken

out of context, suggesting that what he really meant was only that there was lead-based paint in "places" or "areas" of the Subject Property. He did not mean, so Petitioner claims, that lead was in the top layer of paint. This may be so; however, as he was her expert witness, it was her responsibility to make certain that he explained himself in a manner that would not confuse the trier of fact (let alone appellate courts). If Dr. Paulson meant simply that lead-based paint was somewhere at the Subject Property and he did not rely on the Un–Redacted ARC Report in reaching that opinion, Petitioner had the opportunity to develop fully his testimony to be clear that that was the case. We, on appellate review, shall not reverse the discretionary ruling of the trial judge by assuming that Dr. Paulson meant what Petitioner now claims.

Petitioner next complains that, even if the trial judge did not abuse her discretion in admitting the Un–Redacted ARC Report under Rule 5–703, the report was not relevant to the condition of the paint at the Subject Property while Petitioner resided there from 1990 to 1994. She points out that Respondents, as reflected in their counsel's closing argument, relied on the un-redacted report to bolster their winning argument that there was no peeling, chipping, or flaking paint at the Subject Property during that time-frame. According to Petitioner, Respondents did not lay a proper foundation for the proposition that the condition of the paint in May 1999 (as represented by the Un–Redacted ARC Report) accurately reflected the condition of the paint from 1990 to 1994.

Respondents counter that Petitioner waived this contention because she did not request a limiting instruction under Maryland Rule 5–703 and did not object to the manner in which they relied on the Un–Redacted ARC Report in their closing argument. We agree with Respondents. Neither the parties' briefs, the joint stipulation, nor the record provided suggests to us that the Un–Redacted ARC Report was admitted for any purpose other than to illuminate the testimony of Petitioner's experts. Thus, Petitioner's assertion—that the un-redacted report was not relevant to the question of the

paint's condition while she resided at the Subject Property—takes aim only at the manner in which Respondents relied on the evidence.

Petitioner concedes that she never requested a limiting instruction under Rule 5–703(b) ("Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference."); however, she seeks to excuse her failure by claiming that Respondents did not raise Rule 5–703 as a basis for admitting the Un–Redacted ARC Report. Her excuse is not convincing. Even if Respondents never cited expressly the rule, the joint stipulation provided by the parties reveals that Respondents argued before the trial court that the un-redacted report was admissible because Petitioner's experts relied on it. Additionally, as with any evidence that potentially could be misused, Petitioner could have requested a limiting instruction under Rule 5–105 [27] as well. Moreover, Petitioner did not object when, during closing argument, Respondents' counsel cited the Un–Redacted ARC Report as evidence that the paint at the Subject Property was "intact" while Petitioner resided there. *See Farley v. Allstate Ins. Co.*, 355 Md. 34, 733 A.2d 1014 (1999) ("Even if Allstate's comments during closing arguments were prejudicial and resulted in an inadequate verdict, it was incumbent upon Farley's counsel to immediately object so that the trial judge could properly rule on the matter.").

Accordingly, we resolve that Petitioner's argument—that the Un–Redacted ARC Report did not constitute relevant evidence of the paint's condition between 1990 and 1994—has been waived.

---

**27.** Rule 5–105 provides:

**Limited admissibility.**

When evidence is admitted that is admissible as to one party or for one purpose but not admissible as to another party or for another purpose, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

In addition to waiving her relevancy objection, Petitioner also fails to establish that she was prejudiced by the Respondents' use of the Un–Redacted ARC Report, even if the report was admitted erroneously as evidence relevant to whether peeling, chipping, or flaking paint existed at the Subject Property between 1990 and 1994, as Judge Murphy's dissent persuasively reasons. We are not persuaded that a different result would have obtained if the trial court excluded the Un–Redacted ARC Report. *See Flores,* 398 Md. at 34, 919 A.2d at 720. Ms. Queen's testimony was the only evidence adduced by Petitioner to support the claim that the paint at the Subject Property was chipping, peeling, or flaking during Petitioner's residence. Respondents, on the other hand, adduced evidence that the paint was intact when Petitioner initially moved into the Subject Property and that no "loose paint/plaster" was observed in 1992 by the Baltimore City Health Department. The report prepared by the Health Department also revealed that Ms. Queen informed the inspector that Petitioner was poisoned at another property. Additionally, Respondents adduced testimony by one of the manager's of the Subject Property that Petitioner's grandparents (the tenants identified on the lease) inspected the Subject Property before Petitioner moved in and did not find any defects, as well as evidence that the Subject Property was painted and wallpapered shortly before Petitioner began residing there and that the property manager did not receive any complaints about the paint.[28] Keeping in mind that, "[i]n any tort action, ... the burden is on the plaintiff to prove by a

---

**28.** The fact that the property manager did not receive any complaints came to light during Petitioner's re-direct examination of the property manager, Daniel Perlberg, whom she called as a witness:

Q You told us on my direct examination that you never inspected [the Subject Property]. Is that correct?
A No.

. . . .

I didn't inspect it. There was no—can I answer that?
THE COURT: Yes.
Q Well—
A The only reason I would answer [sic] is if there was a complaint made and there weren't any complaints made.

preponderance of the evidence that it is more probable than not that the defendant's act caused his injury," Petitioner's argument—that the Un–Redacted ARC Report likely changed the outcome of this case—falls short. *See Med. Mut. Lib. Soc'y v. B. Dixon Evander & Assocs.*, 339 Md. 41, 54, 660 A.2d 433, 439 (1995).

### Conclusion

We affirm the judgment of the Court of Special Appeals. Petitioner, on the record before us, was not shown to be harmed sufficiently by the trial judge's decision (though found in hindsight to be erroneous) to permit Respondents to read into evidence excerpts from Ms. Queen's deposition during the defense case, and the trial judge did not abuse her discretion in allowing Respondents to introduce into evidence the Un–Redacted ARC Report under Md. Rule 5–703. Even had it been error to admit the un-redacted report, Petitioner failed to persuade us that she was prejudiced by its admission or its use at trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

BELL, C.J., Dissents.

MURPHY, J., Concurs and Dissents.

Dissenting Opinion by BELL, C.J.

Catherlina Queen ("Ms.Queen"), aunt and next friend of Lanay Brown, filed suit individually and on behalf of Lanay Brown, the petitioner, against the respondents, Daniel Realty Company, Daniel Perlberg and Wendy Perlberg, alleging negligence and violations of the Maryland Consumer Protection Act, Maryland Code (2005 Repl.Vol., 2008 Supp.) § 13–301 *et seq.* of the Commercial Law Article. The counts pertaining to Ms. Queen individually were derivative of Lanay Brown's claims. Specifically, she alleged that, because of the respon-

dents' wrongful and negligent acts and omissions, resulting in Lanay Brown's illnesses and infirmities, she:

"1) suffered loss and damage and will be deprived of and will lose the infant's services during minority.

"2) has been and will be required to incur expenses for hospital care and treatment and for the services of physicians and surgeons required to treat and administer to [Lanay Brown's] injuries, illnesses and infirmities.

"3) was required to witness her child being administered painful drug therapy as before described and to witness painful blood tests which caused the Plaintiff severe emotional distress and mental anguish.

"4) was required to take her child for additional frequent medical visits for the follow-up of lead poisoning which were over and above the normal pediatric visits which would have been required absent the negligence of the Defendant.

"5) has otherwise sustained and will sustain loss and damage."

During the plaintiffs' case-in-chief, Ms. Queen, the Plaintiffs' fact witness,[1] who was at that time a "party," testified to the condition of the subject premises, 3630 Reisterstown Road, both at the inception of, and during, the tenancy. While she acknowledged that the condition was "okay" when they first moved in, she testified that, after they had lived there for a while, "five or six months later,

"It was like when you come in the front door, it was like a hole was in the wall, and the paint was chipping when you go up the stairs. Then when you go in the bathroom, the floor was chipping and the windows was chipping. And in the kitchen and the dining room it was leaking."

Directed by counsel, she elucidated:

"[Counsel]: Okay. Now, I want to go through the things you mentioned one at a time and ask you to tell the jury about them. Okay. First, you told us about the front door. Can

---

**1.** Also testifying, in relevant part, was Dr. Jerome Paulson, an expert in childhood lead poisoning.

you describe to the members of the jury what, if anything, you noticed about the front door area of the home around five to six months after you moved into the house?

"[Ms. Queen]: It was like when you enter the door, it looked like a hole was in the wall with like white stuff coming out of it like sheetrock looking stuff or whatever was coming out of it. I can't say because I don't know.

"[Counsel]: Okay. And then you also mentioned the steps, or the stairs, to use your exact words. Can you tell the members of the jury what, if anything, you noticed about the condition of the paint starting five to six months after you moved in, on the stairs?

"[Ms. Queen]: Like the paint was chipping, like often like it was paint over paint starting to chip.

"[Counsel]: Okay. And you also mentioned the windows. Can you tell the members of the jury which windows you noticed chipping and peeling paint at 3630 Reisterstown Road beginning five to six months after you moved in?

"[Ms. Queen]: It was like the bedrooms and the living room and the dining room.

"[Counsel]: Okay. And you also mentioned something about the bathroom floor. The bathroom floor, was it tiled, was it carpeted, was it painted? Describe the floor to the members of the jury?

"[Ms. Queen]: It was sort of like tile looking or like something and then somebody painted over top of it burgundy.

"[Counsel]: Okay. And can you tell the members of the jury what, if anything, you noticed about the painted tile floor in the bathroom beginning five to six months or so after you moved in?

"[Ms. Queen]: After a while it started chipping and coming up, you know, like paint chipping.

"[Counsel]: Okay. Now, I want to go downstairs now into the—you mentioned the kitchen and the dining room and you mentioned a leak.

"[Ms. Queen]: Uh-huh.

"[Counsel]: Can you describe to the members of the jury what you meant by that?

"[Ms. Queen]: I meant by when it rained, it used to come through the window like a waterfalls.

"[Counsel]: How do you mean by that?

"[Ms. Queen]: Because when it rained, it would come through where the wood or the board is. The water would come down really hard and it would come on the floor like and the window.

"[Counsel]: All right. Now, can you tell us, please, what if anything you noticed happened to the painted areas around the area in the kitchen and the dining room where the water was coming in?

"[Ms. Queen]: It was starting to chip more."

The respondents' cross-examination of Ms. Queen sought to establish discrepancies between her trial testimony and that given on deposition and, thereby, undermine her credibility. One of the avenues they pursued to do so was to focus on who, besides her and Lanay Brown, resided at the subject premises during the relevant and applicable period.[2] At the conclusion

---

2. The relevant colloquy was as follows:

"[Counsel]: Now, first of all, you were talking about your step-father, Mr. Brown, living with you.

"[Ms. Queen]: Yes.

"[Counsel]: Do you recall telling me in deposition—well, not me, but someone from my office who took your deposition—that Mr. Brown didn't live at 3630 Reisterstown Road?

"[Ms. Queen]: He lived there but he just wasn't being there. He lived there. That was his residence. He lived there. Yes, he lived there. I don't recall.

\* \* \*

"[Counsel]: Okay. Did Mr. Brown live at 3630 Reisterstown Road?

"[Ms. Queen]: Yes.

of the plaintiffs' case-in-chief, the respondents made a motion for judgment as to each of Ms. Queen's individual claims. Without opposition, the trial court granted that motion.

Nevertheless, even though Ms. Queen was no longer a party to the action, the respondents sought, during their case-in-chief, to read Ms. Queen's pre-trial deposition testimony to the jury as substantive evidence, and, over the petitioner's objection, the trial court permitted them to do so.[3] The majority

---

"[Counsel]: Okay. Let me refer you to—and I'll give you a copy of your deposition—page thirty-three. I'm going to hand it to you, if you don't mind. There it is. There is page thirty-three.

\* \* \*

"[Counsel]: I'll show it to you. On page thirty-three, you were asked: "You don't know if your father lived with you at 3630 Reisterstown Road.

\* \* \*

"[Counsel]: Answer: "I wasn't—no, I am not sure. He lived there but he didn't come there. So I say no." Question: "He lived there but he didn't come there?" Answer: "He paid everything, paid bills. It is their house but they don't stay there." Question: "We are referring to Robert Brown?"
Answer: "Yes."
"[Ms. Queen]: Yes.
"[Counsel]: So do you recall testifying that Mr. Brown, in fact, didn't live at 3630 Reisterstown Road?
"[Ms. Queen]: I said—you said I said he lived there but he don't stay there. Yes.
"[Counsel]: Okay. Now, when you said in this testimony that they didn't live there, that they didn't stay there—
"[Ms. Queen]: My mother stayed there."
Whether, and, if so, to what extent, they successfully highlighted the inconsistency between her pre-trial deposition testimony and trial testimony regarding whether her stepfather lived with her and Lanay at the Subject Property, thus convincing the jury of her lack of credibility, were matters for, and left to be resolved by, the jury.

3. The parties stipulate that the basis for the Circuit Court's ruling to admit Ms. Queen's deposition testimony as substantive evidence was Maryland Rule 2–419(a)(2). That Rule, captioned *"Deposition–Use.,"* provides:

"(a) *When may be used.*

\* \* \*

"(2) The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, managing agent, or a person designated under Rule 2–412(d) to testify on behalf of a public or

holds, correctly, that, because Ms. Queen was not a "party" when they read portions of her deposition into evidence during their case-in-chief, it was error for the trial court to have admitted it as substantive evidence. 409 Md. 565, 596, 976 A.2d 300, 318–19. Interpreting Rule 2–419(a)(2), it explains that the respondents were not, on that account, permitted to use Ms. Queen's deposition testimony freely for "any purpose." *Id.* at 596, 976 A.2d at 318–19. With this holding and rationale, I agree. Rather than reversing and remanding for a new trial, however, the majority proceeds to declare the error harmless. With this conclusion, I cannot agree. In my opinion, the trial court's erroneous evidentiary ruling was anything but harmless. Indeed, because the effect of the ruling was to revisit and re-categorize testimony presented earlier at trial and unduly emphasize it, its impact on Lanay Brown's case was devastating. Undoubtedly, it impacted the jury's verdict, thus prejudicing Lanay Brown.

To be sure, Ms. Queen was an important witness for the petitioner. It is likewise true that Ms. Queen's deposition testimony differed from her trial testimony and, as a result potentially, could have undermined her credibility and, as a result, the petitioner's case. Moreover, the discrepancy was before the jury. The respondents presented, during their cross-examination of her testimony in chief, as impeachment evidence—not substantive evidence—, Ms. Queen's deposition testimony as a counterpoint to Ms. Queen's testimony at trial. Whether that evidence did, or would, or how significantly, if at all, undermine Ms. Queen's credibility and, consequently, the petitioner's case, was a jury question. But the jury did not get to answer that question. When the case was presented to the jury for decision, notwithstanding that the only plaintiff remaining was Lanay Brown, as to whom the only evidence properly considered by the jury to decide her case was that amassed during her case-in-chief, impeachment evidence of Ms. Queen's deposition testimony again had been offered and

---

private corporation, partnership, association, or governmental agency which is a party may be used by an adverse party for any purpose."

permitted to be read into the record as substantive evidence. Never mind that Ms. Queen was no longer a party, evidence, admissible only if she were—her deposition testimony as substantive evidence—and which earlier has been admitted to impeach Ms. Queen, was nevertheless admitted, thus giving it undue emphasis and making it available to combine with its earlier incarnation, as impeachment evidence, to undercut Ms. Queen's credibility and, in turn and predictably, to prejudice Lanay Brown's case.

The first question on the special verdict sheet required the jury to determine whether the paint at the subject premises was "flaking, chipping, or peeling ... while Lanay Brown resided there[.]" How it was resolved was an issue critical and of paramount importance to both sides. Its resolution also was largely, if not entirely, dependent on credibility of the witnesses and of the evidence.

At trial, the jury heard conflicting evidence about the condition of the paint at the Subject Property when the petitioner resided there with Ms. Queen. As indicated, Ms. Queen testified on behalf of the petitioner. Her testimony is set forth hereinbefore. That testimony was countered by the respondents, who offered largely documentary evidence tending to contradict Ms. Queen. Daniel Perlberg, a respondent, and also the landlord and partial owner of Daniel Realty, offered documentary evidence that Daniel Realty paid to have the inside of the subject premises wallpapered before Ms. Queen and Lanay moved in, suggesting that any assertions of chipping, peeling or flaking paint by the petitioner were not to be believed. The respondents also offered a Lead Inspection Report that was conducted by the Baltimore City Health Department when the petitioner and Ms. Queen resided at the property. Significantly, they proffered, the inspector who completed the Report did not circle that there was "Loose paint/plaster" in the Subject Property. According to the respondents, this further supported their contention that there was no chipping, peeling or flaking paint at the Subject Property when the petitioner and Ms. Queen lived there. The respondents also presented evidence that Ms. Queen's parents,

the lessees of the premises, inspected the property upon signing the lease and found no chipping, peeling or flaking paint.

"In the interest of the orderly administration of justice, and to avoid useless expense to the state and to litigants in its courts, it has long been the settled policy of this [C]ourt not to reverse for harmless error." *Johnson & Higgins, Inc. v. Simpson*, 163 Md. 574, 588, 163 A. 832, 837 (1933). The justification for this policy is the need to conserve scarce resources, which is accomplished when the litigants are not forced to relitigate a case where the error had no impact on the outcome of the trial. *Id.* In civil cases, the complaining party has the burden of establishing that the trial court committed an error and that the error was prejudicial. *Flores v. Bell*, 398 Md. 27, 33, 919 A.2d 716, 719 (2007); *Harris v. Harris, P.A.*, 310 Md. 310, 319, 529 A.2d 356, 360 (1987) (citing *Beahm v. Shortall*, 279 Md. 321, 330, 368 A.2d 1005, 1011 (1977)). There is prejudice, our cases have concluded, when the error influenced the outcome of the case. *Benik v. Hatcher*, 358 Md. 507, 537, 750 A.2d 10, 26 (2000); *Beahm v. Shortall*, 279 Md. 321, 330–31, 368 A.2d 1005, 1018 (1977); *State Roads Comm'n v. Kuenne*, 240 Md. 232, 235, 213 A.2d 567, 568 (1965). In order to determine whether an error was prejudicial, an appellate court must proceed on a case-by-case basis. *Beahm*, 279 Md. at 332, 368 A.2d at 1012. "Before we can reverse the ruling excepted to, we must be able to see that the party really has ground for exception, and may have been injured by what was done." *Lawson v. Price*, 45 Md. 123, 133(1876). In making a harmless error determination, we must determine whether the alleged error probably, as opposed to possibly, prejudiced the complaining party. *Crane v. Dunn*, 382 Md. 83, 91, 854 A.2d 1180, 1185 (2004); *Blondes v. Hayes*, 29 Md.App. 663, 671, 350 A.2d 163, 167 (1976) (noting that appellate courts are "restricted to seeking probabilities of prejudice as opposed to proofs thereof").

As we have seen, the majority has held that, permitting the respondents to read Ms. Queen's pre-trial deposition testimony to the jury as substantive evidence during their case-in-

chief was error. *See* 409 Md. at 596, 976 A.2d at 318–19. Thus, the petitioner has cleared the first hurdle, established the error. In concluding that the error was harmless, the majority relies on the fact that the portions of Ms. Queen's pre-trial deposition that were read to the jury by the respondents had already been brought to the jury's attention when Ms. Queen was cross-examined during the plaintiffs' case-in-chief. *See* 409 Md. at 597, 976 A.2d at 319. It reasons: "In other words, the damaging features of Ms. Queen's deposition testimony already were before the jury, regardless of Respondents' potentially duplicative use of the deposition during their defense case." *Id.*

The majority is wrong for two reasons. First, the fact of the matter is that, due to a technical malfunction with the audio recording device during the trial, during the respondents' case-in-chief, coupled with the inability of the parties to recall, it is impossible to know precisely what portions of Ms. Queen's pre-trial deposition testimony were read to the jury during the respondents' case-in-chief. *See* 409 Md. at 576, 976 A.2d at 306. In fact, having no independent recollection, and being unable to agree, all the parties could do was stipulate as to which portions of Ms. Queen's deposition *might have been read* to the jury, based on marks made by the respondents' counsel in their trial notes.[4] In my opinion, given the state of this record, the petitioner has cleared the second hurdle.

To prevail, I submit, at minimum, there must be an identity between what the respondents presented to impeach Ms.

---

4. The stipulation provided:

"At the close of their case, Appellees requested that they be permitted to read certain portions of the discovery deposition of Catherlina Queen into evidence. Ms. Queen initially was a party to this case, but, upon Appellees' Motion at the end of Appellants' case, her claims were dismissed. The parties stipulate that the following testimony from the deposition may have been read into evidence during the trial. The parties have no independent recollection of what was actually read into evidence, however, the following list is what was marked by Appellees' counsel in their trial notes for possible reading into evidence at trial...."

Queen's testimony during the petitioner's case-in-chief and what they read into the record as substantive evidence during their case-in-chief. To the extent that the substantive evidence differs from the impeachment evidence, because it is admissible only as to Ms. Queen and inadmissible against the petitioner, it prejudices the petitioner. There are glaring gaps in the record respecting this question. The identity of the evidence cannot be established by conjecture, surmise or speculation. To hold otherwise is to apply a different, hitherto unrequired, standard and place an impossible burden on the petitioner.

As indicated, the parties do not agree as to what was read to the jury. As we have seen, only the portion of Ms. Queen's deposition relating to the residence of her step father was read into the record during her cross-examination by the respondents. Thus, it is only that portion of the deposition that, when read in the respondents' case-in-chief, could arguably be the basis for finding harmless error. Assuming that it was read into the record during the respondents' case-in-chief, the petitioner argues that, during the respondents' case,[5] other

---

**5.** The portions marked by trial counsel are a good deal more expansive than the line of impeachment pursued during the petitioner's case-in-chief:

"[Respondents' Counsel ("Counsel") ]: Can you state your name, for the record, please?
"[Ms. Queen]: Catherlina Queen.

\* \* \*

"[Counsel]: And before 3630 Reisterstown Road, where did you live?
"[Ms. Queen]: 911 East Biddle Street. Biddle, off of Wilcot.
"[Counsel]: When did you first move into there?
"[Ms. Queen]: I don't remember. I don't know. I don't remember that.
"[Counsel]: Do you know if you lived at 911 East Biddle Street more than a year or less than a year?
"[Ms. Queen]: I am not sure.
"[Counsel]: Do you ever remember living at 911 East Preston Street?
"[Ms. Queen]: Say it again
"[Counsel]: Do you ever remember living at 911 Preston Street?
"[Ms. Queen]: Yes.
"[Counsel]: Is 911 East Preston and 911 East Biddle, are they the same address?

"[Ms. Queen]: Whoever told you, it is not Biddle, we were living on Preston Street.

\* \* \*

"[Counsel]: How old was April Brown when she had Lanay Brown?
"[Ms. Queen]: She probably was, I will say—I am not sure, but I will say 15.

\* \* \*

"[Counsel]: After Lanay was born, did April Brown have any involvement in raising her or anything like that?
"Ms. BRANDT [Plaintiffs' Counsel]: Objection.
"[Ms. Queen]: No, ma'am.
"[Counsel]: Who is Lanay Brown's biological father?
"[Ms. Queen]: Danny Thompson.
"[Counsel]: If you know, when you gained formal legal guardianship of Lanay Brown, did Mr. Thompson have to relinquish any rights or anything like that? I am asking because I don't know how it works.
"[Ms. Queen]: He don't have no rights, either, because he gave them up.
"[Counsel]: Would he have given them up when you obtained legal guardianship of Lanay?
"[Ms. Queen]: Yes.
"[Counsel]: Is the same true with respect to April Brown, when you gained legal guardianship, did she relinquish her parental rights to Lanay Brown?
"[Ms. Queen]: She gave it up, too, yes.
"[Counsel]: Do you know where Danny Thompson is now?
"[Ms. Queen]: No, I don't, no, ma'am.
"[Counsel]: Do you know if he is alive?
"[Ms. Queen]: He is alive, but I don't know where he at.
"[Counsel]: Do you know where April Brown is?
"[Ms. Queen]: She is alive. I don't know where she is at, either.

\* \* \*

"[Counsel]: Did your father live with you at 3630 Reisterstown Road?
"[Ms. Queen]: I don't know those people's business. No, I don't know.
"[Counsel]: You don't know if your father lived with you at 3630 Reisterstown Road?
"[Ms. Queen]: I wasn't—no, I am not sure. He lived there, but he didn't come there, so, I say no.
"[Counsel]: He lived there, but he didn't come there?
"[Ms. Queen]: He paid everything, paid bills.
"[Counsel]: We are referring to Robert Brown?
"[Ms. Queen]: Yes.
"[Counsel]: Do you know where Robert Brown was actually staying or sleeping?
"[Ms. Queen]: He had his own apartment somewhere.

\* \* \*

"[Counsel]: Do you know the name of the landlord of 3630 Reisterstown Road?
"[Ms. Queen]: Ma'am, I don't know. I don't.

portions of the deposition may have been read into the record as substantive evidence also. Specifically, she asserts, based on the respondents' statement during closing argument,[6] that it is likely that the respondents read to the jury the portion of Ms. Queen's deposition testimony where she did not recall that the subject property had been newly wallpapered and those portions in which Ms. Queen admitted that the respondents occasionally sent people to the subject property to make repairs. On this record, it is not even clear that the same portion of Ms. Queen's deposition used by the respondents in their cross-examination of Ms. Queen during the plaintiffs'

---

"[Counsel]: Do you remember ever speaking with the landlord at 3630 Reisterstown Road?
"[Ms. Queen]: I don't know.
"[Counsel]: Do you know who primarily dealt with the landlord at 3630 Reisterstown Road?
"[Ms. Queen]: My mother or, maybe, my older sister. My mother, was sick, paying the bills.
"[Counsel]: Which older sister are you referring to?
"[Ms. Queen]: Annis.

\* \* \*

"[Counsel]: Do you know how many times the landlord, or property manager, or anyone on their behalf came out to fix the chipping and peeling paint?
"[Ms. Queen]: I will say, about, three times before, just while we lived there.

\* \* \*

"[Counsel]: Now, prior to 3630 Reisterstown Road, you testified that you lived at 911 Preston Street, is that correct?
"[Ms. Queen]: Yes.
"[Counsel]: Who lived with you at 911 East Preston Street?
"[Ms. Queen]: Annis, Lakisha, April, Robin. I don't know after that.

\* \* \*

"[Counsel]: After Lanay was born, what, if any, contact has Lanay had with her biological father?
"Ms. BRANDT [Plaintiffs' Counsel]: Objection
"[Ms. Queen]: He don't do nothing for her."

6. During closing arguments, counsel for the respondents said the following, in relevant part: "Testimony of Ms. Queen. I put all the evidence here. Ms. Queen testified there was chipping and peeling paint at the property, no doubt about it. But I ask you to think about when I read portions of her deposition she didn't remember anything about the house. She didn't remember if father and mother lived there. In fact she said in her deposition they didn't. She didn't remember the whole new wallpaper when I asked her."

case-in-chief was also read to the jury during their case-in-chief. But even were we to accept the respondents' position that they read the same portion of Ms. Queen's deposition both in Lanay Brown's case-in-chief, and in theirs, it must also be accepted, as the respondents suggested in their closing argument, that they read more than that.

As important, there is a difference between impeaching a witness on cross-examination with her pre-trial deposition testimony and reading that same testimony to the jury as substantive evidence. For example, when a witness is impeached on cross-examination with a prior inconsistent statement, that statement cannot be used for the truth of its assertion, assuming that it does not fall within a hearsay exception. *See* McCormick on Evidence, § 34, at 67 (Edward W. Cleary, 2d ed.1972). Rather, the inconsistent statement can be used by the jury, if it so chooses, to draw a negative inference on that witness's credibility. McCormick on Evidence, § 33, at 66 (Edward W. Cleary, 2d ed.1972). Substantive evidence on the other hand, which is how Ms. Queen's deposition was categorized when the trial judge erroneously permitted the respondents to read it to the jury, is not so limited in its effect. Substantive evidence can be used not only as a foundation to diminish the credibility of the witness who made a prior inconsistent statement under oath, but it also can be used by the jury to establish the truth of the matters asserted in that statement. McCormick on Evidence, § 251, at 601 (Edward W. Cleary, 2d ed.1972). Thus, due to the dual nature in which it can be used, substantive evidence takes on a different quality than simple impeachment evidence. For example, Ms. Queen's deposition testimony, during the petitioner's case-in-chief, could have been used by the respondents on cross-examination only to impeach Ms. Queen. The trial judge's erroneous evidentiary ruling, however, allowed the respondents to amplify and reconfigure the adverse impact of Ms. Queen's deposition testimony by permitting the respondents to use it as substantive evidence during the respondents' case-in-chief. The majority's opinion does not

even mention or appreciate this important evidentiary distinction or its potential impact on the jury's use of it.

More important, in a case in which credibility was critical, as a result of the trial court's error, the jury was presented on multiple, qualitatively different, occasions with evidence of inconsistencies in an important plaintiff witness's testimony and her pre-trial deposition. Its first exposure came early in the trial, during the plaintiff's case, and it was proper. The second presentation came in the defendants' case, well into the case. Moreover, the evidence of inconsistency presented on the second occasion, which was not even the same evidence as that presented on the first—it arguably was much more extensive, covering more incidents and instances—was met with a timely and meritorious objection. Overruling the objection permitted the respondents to call attention to the earlier evidence of inconsistency, to highlight it, and introduce other inconsistencies. In addition, offering the deposition testimony later in the trial and as substantive evidence was designed to, and did, emphasize, unduly so, the inconsistencies they contained.

The more a jury is exposed to evidence the greater the danger, which is inherent, that the jury will give more weight to that evidence than it is due. *See, e.g., United States v. Walker,* 1 F.3d 423, 430 (6th Cir.1993) (making that point in the context of "read back" of a witness's testimony during jury deliberations) (citing *United States v. Padin,* 787 F.2d 1071, 1076 (6th Cir.1986)); *United States v. Varsalona,* 710 F.2d 418, 421 (8th Cir.1983). Reading deposition testimony late in the trial, after the deponent has testified, and after some of the deponent's deposition has earlier been read into the record to impeach the deponent on the witness stand, certainly could have, and I submit had, that effect in this case. And, as indicated, timing does matter. When evidence, in this case, the deposition, is presented, it may well influence, and likely did in this case, the importance the jury ascribes to it. Not only were the respondents permitted to revisit Ms. Queen's cross-examination and highlight the discrepancies, of which it then apprised the jury, they were permitted—when to do so

was inappropriate and violative of the Rules—to present additional discrepancies, not earlier presented, so as to be able to buttress their argument that Ms. Queen was not to be believed.

The majority's harmless error determination is based not only on an incomplete record but also on faulty logic. Indeed, one must ask, "If reading Ms. Queen's pre-trial deposition testimony was not prejudicial or harmful to the petitioner's case, then why would the respondents do it?" This is the question that the majority cannot answer. That the respondents sought to, and did, read portions of Ms. Queen's deposition testimony to the jury, as substantive evidence, during their case-in-chief makes clear that they thought that those portions helped their case, and that such evidence was prejudicial to the petitioner. They viewed the evidence as solidifying the attack on Ms. Queen's credibility and, in so doing, harming the petitioner's case.

In this case, the petitioner recognized the prejudice and interposed a timely objection. There was nothing more she could do. A party who prevails on an objection should not bear the brunt of an erroneous trial ruling, urged by the party who did not. There should be some consequence for an erroneous ruling and, correspondingly, some reward to a vigilant litigant, especially where there is no lapse in that vigilance. If there is not, future litigants are given the "green light" to push the evidentiary rules to the furthest extent possible, knowing that an appellate court is not likely to order a new trial. If the evidentiary rules in this State are to mean anything, then appellate courts must create incentives for trial litigants to apply these rules correctly in the first instance.

I dissent. I also join Judge Murphy's dissent.

Concurring & Dissenting Opinion by MURPHY, J., which BELL, C.J. joins in dissent only.

Although I agree with much in Chief Judge Bell's dissent, I am not persuaded that Petitioners were *actually prejudiced* by the error that occurred when Ms. Queen's deposition was

used by Respondents during the presentation of their evidence. I therefore agree with the majority that Petitioners are not entitled to a new trial on that ground. For the reasons that follow, however, I dissent from the holding that "the trial judge did not abuse her discretion in allowing Respondents to introduce into evidence the Un–Redacted ARC Report."

In *Sims v. State*, 319 Md. 540, 573 A.2d 1317 (1990), while affirming a ruling that prohibited a murder defendant from presenting evidence of the victim's "rowdy" behavior several hours before the victim was shot and killed, this Court stated:

> The inferential value of proof of the existence of a condition at one point in time to prove its existence at a later point of time depends on a variety of circumstances.
>
> When the existence of an object, condition, quality, or tendency at a given time is in issue, the *prior existence* of it is in human experience some indication of its probable persistence or continuance *at a later period.*
>
> The degree of probability of this continuance depends on the chances of intervening circumstances having occurred to bring the existence to an end. The possibility of such circumstances will depend almost entirely on the nature of the specific thing whose existence is in issue and the particular circumstances affecting it in the case in hand.... So far, then, as the *interval of time* is concerned, no fixed rule can be laid down; the nature of the thing and the circumstances of the particular case must control. (Emphasis in original).
>
> 2 *Wigmore on Evidence* § 437 (3d ed.1940).

In ... *Stitzel v. Kurz*, 18 Md.App. 525, 308 A.2d 430, *cert. denied*, 269 Md. 761 (1973), the Court of Special Appeals held that evidence concerning the condition of a road sign was properly admitted:

> When it is shown that a condition existed at a certain time, and the condition is one which by its nature is relatively permanent, rather than transitory or changeable, it is rational to infer that the same condition existed

before and after the time shown, for a length of time reasonably consistent with the circumstances, unless there is evidence from which a change in the condition could reasonably be inferred.

In dealing with conditions more likely to change, however, this Court has recognized that evidence of the earlier condition may not have sufficient probative value to be admissible.

*Id.* at 555–57, 573 A.2d at 1324–25. (Emphasis in original).

In *Stitzel, supra,* the Court of Special Appeals reversed a "directed verdict" that had been entered in favor of Baltimore County and against the parents of a young man who sustained fatal injuries on September 11, 1970 when an automobile being driven by the deceased's friend left the road and struck a utility pole. The driver testified that the accident occurred after he passed a road sign indicating a curve to the right, and slowed down in anticipation of that curve. Unfortunately, that road sign was "incorrect." According to Baltimore County's Director of Traffic Engineering, (1) when the "incorrect" sign was installed on May 1, 1970, the Department should have installed "a left reverse curve sign at this location," and (2) the mistake was corrected on October 5, 1970, on which day the Department removed the sign "showing the curve to be in the direction opposite to the direction of the actual curve." *Id.* at 530, 308 A.2d at 433.

At the conclusion of the plaintiffs' case-in-chief, Baltimore County argued that "there was no evidence that the sign was incorrect at the time of the accident," and the Circuit Court's "directed verdict" was based on its finding "that there was no evidence that the County had knowledge of an erroneous sign, nor was there any evidence of when the erroneous sign became so[.]" *Id.* at 536, 308 A.2d at 437. While holding that "[i]t was error to direct a verdict for Baltimore County," the Court of Special Appeals stated:

The jury could properly have found in this case that the sign was erected incorrectly by Baltimore County on 1 May 1970 and remained that way until it was corrected on 5

October 1970. It follows that the evidence was sufficient to permit the jury to find that Baltimore County was negligent and that its negligence was a proximate cause of the injury. *Id.* at 538, 308 A.2d at 438.

Because the condition of paint on a wall (or woodwork, or a door, or a windowsill) is "transitory or changeable," evidence of the condition of the paint in 1999 simply does not permit a *rational* inference that the same condition existed in 1994. Moreover, the fact that Respondents sold the property in 1995 constitutes "evidence from which a change in the condition [of the paint] could be reasonably inferred." Under these circumstances, I would hold that Petitioners were unfairly prejudiced by (1) the Circuit Court's erroneous failure to exclude the Un–Redacted ARC Report, and (2) the argument of Respondents' counsel that this report constituted *relevant* "circumstantial evidence" that "the paint was never chipping, peeling, or flaking while [Petitioners] lived there[.]"

While Maryland Rule 5–403 provides trial judges with the discretion to exclude relevant evidence, trial judges do not have discretion to admit irrelevant evidence. Maryland Rule 5–402, in pertinent part, provides that, "[e]vidence that is not relevant is not admissible." To resolve the issue of whether the Un–Redacted ARC Report constituted relevant circumstantial evidence in this case, it may be helpful to hypothesize a jury trial of a money damage action for alleged lead paint exposure that will take place later this year. Assume that (1) the family of the injured child lived in the subject property from 1994 to 1997, (2) the defendants who owned this property during that period of time sold it in 1998, (3) an ARC inspector, who was never in the subject property until 2002, conducted tests for "subsurface" lead during that year, and prepared a report that includes a section in which the inspector noted that, "because I observed so much of the paint to be chipping and peeling, *almost none* of the painted surfaces in the property were 'intact,' " and (4) the ARC inspector took photographs of the chipping and peeling paint. Could the plaintiffs introduce the *entire* report into evidence? Should the Circuit Court overrule the defendants' objection to the

ARC inspector's testimony that he observed chipping and peeling paint in 2002? Would the photographs taken in 2002 be admitted as circumstantial evidence of what the subject property looked like from 1994 to 1997 without foundational testimony that these photographs fairly and accurately showed the condition of the paint during those years? I am persuaded beyond a reasonable doubt that the answer to each of these questions should be "no."

The trial judge must order that inadmissible portions of otherwise admissible records be excised or redacted. For example, hospital records include information about whether a person injured in an auto accident was or was not wearing a seatbelt, and whether a person injured while operating a motorcycle was or was not wearing a motorcycle helmet. In personal injury actions arising out of such accidents, however, (1) evidence that the plaintiff was not using his or her seatbelt is prohibited by § 22–412.3 of the Transportation Article, and (2) evidence that the plaintiff was not wearing his or her motorcycle helmet is prohibited by § 21–1306 of the Transportation Article. It is clear that a defendant-driver could not get prohibited evidence before the jury merely because the plaintiff's medical expert reviewed an "un-redacted" hospital record that included the prohibited information. It is equally clear that Respondents should not have been permitted to get the Un–Redacted ARC Report before the jury.

Moreover, the record shows that Respondents argued to the Circuit Court that the Un–Redacted ARC Report should be admitted on the ground that it had been relied upon by Petitioners' experts, and then argued to the jury that this exhibit supported their claim that the paint was intact while Petitioners lived in the property. Under these circumstances, "to curtail abuses, [the ruling admitting the exhibit into evidence should be] subject to review as to the actual use made of the object." *Smith v. Ohio Oil Company, et al.*, 10 Ill.App.2d 67, 134 N.E.2d 526, 531 (1956). I would therefore hold that the "actual use [that Respondents made of the Un–Redacted Report] proved to be an abuse of the ruling." *Id.*

I recognize that, during his direct examination, Dr. Paulson testified that "there was lead paint . . . on multiple surfaces at that address . . . when the home was inspected in May of 1999." Because evidence of the condition of the paint in 1999 does not permit a rational inference that the same condition existed in 1994, this testimony was clearly irrelevant. The record shows, however, that Respondents did not object to this testimony and did not request that it be stricken. Under these circumstances, Respondents were not entitled to introduce their own irrelevant evidence "as an answer to [Dr. Paulson's] irrelevant testimony." *Baltimore & Susquehanna R.R. Co. v. Woodruff,* 4 Md. 242, 255 (1853).

In *Lake Roland Elevated Ry. Co. v. Weir,* 86 Md. 273, 37 A. 714 (1897), this Court stated:

If [a party's] evidence be clearly irrelevant, it should not be admitted on the ground that other irrelevant evidence had already been introduced, unless the latter was admitted by the Court after objection. If the irrelevant evidence is offered by one party, the other side should object to it, and if it be given before its irrelevancy is apparent, the Court should strike it out on proper application.

*Id.* at 277, 37 A. at 716.

In my opinion, Petitioners should be awarded a new trial on the ground that they were unfairly prejudiced by the erroneous admission of the Un–Redacted ARC Report.