Circuit Court for Baltimore City
Case No. 24-C-14-005520

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 87

September Term, 2016

_____

PATRICIA LAMALFA

v.

JANIS HEARN, ET AL.

_____

Eyler, Deborah S.,
Kehoe,
Rodowsky, Lawrence A.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed:  June 28, 2017

In the Circuit Court for Baltimore City, Patricia Lamalfa, the appellant, sued Janis Hearn, the appellee, for automobile negligence. The case was tried to a jury over two days. During the testimony of Ms. Hearn's medical expert, the court admitted into evidence, over objection, four of Ms. Lamalfa's post-accident medical treatment records that the expert relied upon in forming his opinions. At the close of all the evidence, the court granted a motion for judgment in favor Ms. Lamalfa on "negligence" and ruled that the case would go to the jury "for its determination as to the amount of damages, if any that should be awarded." The jury deliberated and returned a verdict in favor of Ms. Lamalfa for $10,576.05, comprising the full amount of her medical bills and $650 for pain and suffering.

On appeal, Ms. Lamalfa presents two questions, which we have combined and rephrased as:

> Did the circuit court err by admitting Ms. Lamalfa's medical records into evidence?[1]

For the following reasons, we shall affirm the judgment of the circuit court.

---

[1] Ms. Lamalfa states her questions presented as follows:

1. Were Defense Exhibits 2–5 inadmissible hearsay due to the failure of authentication as a condition precedent to the business records exception to the hearsay rule?

2. Did the trial court err by admitting medical records pursuant to Maryland Rule 5-703 without an appropriate foundation for establishing the truthfulness of the records?

## FACTS AND PROCEEDINGS

On October 14, 2011, Ms. Lamalfa, who lives in Brooklyn, New York, was in Maryland to attend a family wedding. On the way to the wedding, she was sitting in the rear passenger seat of a small SUV, which was being driven by her son Steven Lamalfa ("Steven"). Steven drove the SUV southbound on Interstate 95, near Pulaski Highway, and onto an exit ramp, where it came to a complete stop because of heavy traffic. The SUV was rear-ended by a vehicle being driven by Ms. Hearn.

Police and ambulances responded to the scene. Ms. Lamalfa did not seek medical treatment. She and the other occupants of the SUV continued on to the wedding. They returned to their hotel in Baltimore that night. The next morning, Ms. Lamalfa went to the emergency room at Mercy Medical Center ("Mercy") in Baltimore with complaints of low back pain and some tenderness in her left forearm. She was treated and released. She returned to New York that night.

A week after the accident, on October 21, 2011, Ms. Lamalfa sought treatment from Yury Koyen, M.D., a specialist in physical medicine and rehabilitation who practices at Relief Medical, P.C., in Brooklyn. She complained of upper and lower back pain, pain in both arms, left hip pain, periodic numbness in her right hand, right shoulder pain, weakness in her left arm, tailbone pain, and emotional distress related to the accident. Dr. Koyen recommended that Ms. Lamalfa undergo physical therapy and chiropractic treatment, as well as diagnostic testing.

Also in October 2011, Ms. Lamalfa began experiencing severe abdominal pain. An October 31, 2011 CT scan of her abdomen was normal, however. In February 2012,

Sampath Kumar, M.D., a general surgeon, diagnosed Ms. Lamalfa with an epigastric hernia. In March 2012, he operated on her to repair it. Ms. Lamalfa previously had had surgery to repair an epigastric hernia in 1984.

Meanwhile, on November 7, 2011, Ms. Lamalfa underwent an MRI of her right shoulder that revealed a rotator cuff injury. More than three years later, in December 2014, Ms. Lamalfa went to see Jaspreet Sekhon, M.D., an orthopedic surgeon. Dr. Sekhon sent Ms. Lamalfa for another MRI, which revealed a rotator cuff tear. In 2015, Dr. Sekhon operated on Ms. Lamalfa's right shoulder.[2]

Ms. Lamalfa filed suit against Ms. Hearn on September 23, 2014.[3] The case was tried to a jury from February 16 to 18, 2016. In the plaintiffs' case, Ms. Lamalfa and Steven testified and the *de bene esse* depositions of Drs. Koyen, Kumar, and Sekhon were played for the jury.[4]

Ms. Lamalfa, then age 54, testified about the accident and about her medical treatment following the accident. She had worked as a hairdresser from the age of 18

---

[2] The record does not reveal the date of the rotator cuff surgery.

[3] Steven and a passenger named Bridgitte Rivera also were plaintiffs. Ms. Rivera settled her claim before trial and dismissed it with prejudice. Steven's claim was tried with his mother's and resulted in a judgment for $8,575.66. He has not joined in this appeal.
The plaintiffs originally included John B. Hearn, Jr., Ms. Hearn's husband, as a defendant, suing him for negligence and negligent entrustment. Those claims were dismissed with prejudice on the first day of trial.

[4] The video depositions were not transcribed and the DVD recordings are not in the record. Thus, we summarize the expert testimony based only upon the excerpts provided by Ms. Hearn in the appendix to her brief.

until about a year before the accident. Shortly after the accident, her abdomen began to feel "weak" and she noticed a "protrusion" between her stomach and her ribcage. She went to see Dr. Kumar and he diagnosed her with an epigastric hernia.

Ms. Lamalfa also began experiencing right shoulder pain in the weeks following the accident that got "progressively worse." She could not hold her grandchildren, lift pots and pans, or reach up to high shelves. She had not experienced right shoulder pain prior to the accident. She did not seek immediate medical treatment for her shoulder pain, however, because she had moved in with her parents and her mother was already providing care for her father following a knee replacement surgery. In December 2014, she went to see Dr. Sekhon and he recommended surgery. Ms. Lamalfa described the recovery following her surgery as "[l]ong and arduous." For more than three months, she had to wear a sling and a bolster on her arm at all times except when she bathed. This made "[s]leeping . . . horrendous." She was still having difficulty sleeping and her shoulder movement remained "impaired."

Dr. Koyen testified by video deposition that to a reasonable degree of medical certainty Ms. Lamalfa's hernia and rotator cuff tear were caused by the October 14, 2011 accident. He opined that the rotator cuff tear to Ms. Lamalfa's right shoulder, as seen on the November 7, 2011 MRI, was consistent with an acute traumatic injury. He acknowledged that the record of Ms. Lamalfa's visit to the Mercy emergency room on October 15, 2011 ("Mercy record"), the day after the accident, did not include any notation of complaints of right shoulder pain or abdominal pain. Dr. Koyen testified that on November 22, 2011, he prepared a report of his treatment of Ms. Lamalfa on October

21, 2011, and up until the date of the report ("Koyen record"). In the report, he did not note that Ms. Lamalfa had complained of any abdominal pain during her initial appointment. His report reflected that she later complained of "severe pains in the abdominal and pelvis area" and, as a result, a CT scan of her abdomen was performed on October 31, 2011.

Dr. Kumar testified by video deposition that Ms. Lamalfa came to see him in February 2012 with complaints of abdominal pain. He palpated her abdomen and diagnosed her with a recurrence of an epigastric hernia. He opined that, given the location of the hernia, it was not surprising that the October 31, 2011 CT scan did not show it. He further opined to a reasonable degree of medical certainty that Ms. Lamalfa's epigastric hernia was caused by the pressure of the seat belt against her abdominal wall during the October 14, 2011 accident. After Dr. Kumar repaired the hernia, he saw Ms. Lamalfa for a routine follow-up appointment. He had not seen her since.

Finally, Dr. Sekhon testified in his video deposition that he met with Ms. Lamalfa for the first time in December 2014. He ordered an MRI, which revealed a rotator cuff tear. He did not review her prior MRI results or her other medical records from 2011.

In her case, Ms. Hearn testified and called Louis Halikman, M.D., an orthopedic surgeon practicing at Mercy. Dr. Halikman had examined Ms. Lamalfa on December 28, 2015, relative to the instant litigation. He noted that she was left-handed and that her upper arms each measured the same girth. Dr. Halikman opined that he would have expected Ms. Lamalfa's right arm "to have been substantially smaller in girth than the

left" given that it was not her dominant arm and because she recently had had surgery on that shoulder. The fact that Ms. Lamalfa's arms were equal in girth was evidence that she was "using both of her arms in as close to natural fashion as possible."

Dr. Halikman explained that in forming his opinions, he relied upon four of Ms. Lamalfa's medical records: the Mercy record; the Koyen record; an "Initial Chiropractic Examination" report prepared by an unidentified practitioner on October 25, 2011 ("Chiropractic record"); and an "Initial Consultation Report" prepared by Alexsandr Levin, M.D., at Diagnostic Medicine, P.C., on December 13, 2011 ("Levin record"). When defense counsel moved to admit the Mercy record into evidence, plaintiff's counsel objected, arguing as follows:

> The expert can certainly testify to [the content of the record] and obviously all his testimony is evidence in the case. However, the document itself is a hearsay document. It contains hearsay statements. It contains expert findings opinions [sic], and it contains secondary and probably even tertiary hearsay statements . . . . I would also, Your Honor, argue that in permitting some records in and not others also is far more prejudice [sic] than probative in that it's going to allow certain documents to go back to the jury room without the benefit of having all of the documents. So on all of those grounds, Your Honor, I would object.

Defense counsel responded that the Mercy record was admissible because it was "a document that the Doctor relied on in forming his opinion . . . [a]nd I believe that is, you know, allows it to come into evidence." The court overruled the objection and admitted the Mercy record.

Defense counsel subsequently moved to admit the other three medical records that Dr. Halikman had relied upon in forming his opinions. Plaintiff's counsel made the "same objection" to each one, and his objections were overruled.

The Mercy record included a narrative "History of Present Illness" section that related that Ms. Lamalfa had been involved in a "rear-ended motor vehicle crash" the day before; that upon impact, she had "immediately . . . reached over to the left side of the car to secure her [infant granddaughter's car seat]"; that "gradually over the course of the afternoon and evening," she began experiencing "left-sided lower back pain"; and that she also "complain[ed] of a much lighter pain in the left forearm." The "Physical Examination: General" section of the Mercy record stated that Ms. Lamalfa "ambulate[d]" with a "slight limp" but without "much difficulty" and did not appear to be in "acute distress." Her abdomen was "[s]oft." She exhibited "positive straight leg raising" on the left side and "difficulty with the lateral oblique motion." She had "full range of motion of all joints." She was discharged with instructions to rest, apply heat to the affected areas, and take over-the-counter pain medication.

The Koyen record, completed on November 22, 2011, was five pages long. In it, Dr. Koyen noted that he had examined Ms. Lamalfa for the first time on October 21, 2011, one week after the accident. At that time, she reported having sustained "injuries to the head, left shoulder and coccyx." In a section entitled "Chief Complaints," Dr. Koyen stated that Ms. Lamalfa had reported

> flashbacks of the accident; neck pains radiating to the right arm and upper back, and to the left arm and forearm; low back pains; left hip pains; periodical [sic] numbness in the right hand; right shoulder pains; weakness in the left arm; fear of sitting in a car; coccyx pains worsened by sitting; [and] claustrophobia after accident.

In the "Review of Systems" section, Dr. Koyen noted "sharp neck pains radiating to the left upper extremity and associated with numbness" and "sharp lumbosacral pains

-7-

provoked by sitting." Ms. Lamalfa was in "acute pain distress" and had pain upon getting on and off the exam table. Dr. Koyen's examination of her shoulders revealed "[r]ight rotator cuff area tenderness" and "[r]ight shoulder[] joint . . . tenderness," with pain upon motion. Her shoulder motion was more limited on the right side, and she was positive for several tests of nerve impingement in her right shoulder. Her abdomen was not tender.

As pertinent, Dr. Koyen recommended that Ms. Lamalfa begin physical therapy for her right shoulder pain; continue taking Aleve; have an x-ray taken of her right shoulder; and consider undergoing an MRI of her right shoulder if the problems persisted. In the "Treatment" section of the report, Dr. Koyen set out the various treatments, tests, and procedures Ms. Lamalfa had undergone following her initial appointment and the results. He noted that due to "severe pains in the abdominal and pelvis area," he had ordered a CT scan; it revealed "no acute inflammatory processes." Due to "severe pains in the right shoulder," he had ordered an MRI; it revealed "possible impingement of the supraspinatus muscle and rotator cuff instrasubstance tear involving supraspinatus and infraspinatus tendons." Dr. Koyen's diagnoses were, as pertinent, "[r]ight shoulder trauma with rotator cuff tear and impingement" and "abdominal trauma."

The Chiropractic record was completed on October 25, 2011. It is a five-page form document with handwritten notations detailing Ms. Lamalfa's health history and the reason she was seeking chiropractic care. In the "Present Complaints" section, the chiropractor circled "Neck Pain & Stiffness Left/Right" that "Radiates" to the "Left . . . Shoulder," as well as right shoulder pain and left arm pain, with numbness and tingling to

the forearm. The "Orthopedic & Neurologic Tests" section reflects that the chiropractor did not perform a "Shoulder Depression Test," or three other tests used to detect nerve impingement and tears in the shoulders. In the "Diagnosis" section, the chiropractor gives diagnoses of spinal radiculopathy, joint dysfunction in the spine; a whiplash injury; headaches; and spinal subluxation. The chiropractor did not circle the diagnostic codes for shoulder injury or shoulder pain.

The Levin record, completed on December 13, 2011, is a three-page initial consultation report addressed to Dr. Koyen. Dr. Levin noted that Ms. Lamalfa complained of "right shoulder pain, lower back pain radiating to the left leg, left knee pain, and weakness in the left leg." On physical examination she was in "no acute distress." She had "no tenderness on palpation or decreased range of motion" in her shoulders. Her abdomen was "[s]oft, not distended" and was not tender. Dr. Levin noted tenderness of the lumbar spine and diagnosed Ms. Lamalfa with "[p]ost-traumatic lumbosacral sprain/strain." He recommended nerve conduction tests to rule out "lumbar radiculitis."

Dr. Halikman opined, based upon a review of these records, his physical examination of Ms. Lamalfa, and his education and experience, that Ms. Lamalfa "did not sustain an injury to her right shoulder as a result of [the automobile accident]." He explained that if Ms. Lamalfa had torn her rotator cuff during the accident, she would have been in severe pain on October 14, 2011, and thereafter would not have waited more than three years to seek out a surgical consultation. He further opined that if she had complained of any shoulder pain at Mercy on October 15, 2011, x-rays would have been

-9-

ordered. The fact that x-rays were not ordered confirmed the narrative aspects of the report, in his view, that reflected that Ms. Lamalfa did not complain of shoulder pain. He further opined that the October 2011 MRI of Ms. Lamalfa's shoulder showed degenerative fraying of the tendons, not a tear consistent with an acute injury to the shoulder caused by an impact. The degeneration of the rotator cuff muscles was not unusual given that Ms. Lamalfa's profession required her to hold her arms up continuously.

Dr. Halikman also commented that the medical records reflected that Ms. Lamalfa's abdomen was soft and not tender in December 2011. He opined that had Ms. Lamalfa had a "problem referable to [that] area," it "would have been evident" by December 2011, when she saw Dr. Levin.

As noted, the court granted a motion for judgment in favor of Ms. Lamalfa for "negligence" and sent the case to the jury on damages only, although the lawyers addressed causation in their closing arguments. Ms. Lamalfa's lawyer asked the jurors to award her all of her past medical expenses ($9,926.05) and non-economic damages in the range of $50,000 to $150,000. Defense counsel argued that the evidence did not show that Ms. Lamalfa's hernia and rotator cuff tear were caused by the accident. She pointed to the four medical records admitted into evidence to show that Ms. Lamalfa did not complain of right shoulder pain or abdominal pain during her Mercy visit; did not complain of abdominal pain during her initial visit to Dr. Koyen a week later; did not complain of right shoulder pain during her chiropractic visit in October 2011; and that her right shoulder was not tender and had full movement and her abdomen was soft and not

-10-

tender during her December 13, 2011 visit to Dr. Levin.  Defense counsel argued that the evidence did not support a finding that the two surgeries were causally related to the accident and that the evidence also did not support a large award for pain and suffering.

The case was sent to the jury on a special verdict sheet asking the jurors to find "[w]hat measure of damages, if any, do you find that the Plaintiff, Patricia Lamalfa, is entitled?" followed by blanks for "Past Medical Expenses," "Non-Economic Damages (Pain, Suffering, Physical Impairment, etc.)," and for the total damages.  The jury awarded Ms. Lamalfa all her past medical expenses ($9,926.05) and $650 in non-economic damages, for a total award of $10,576.05.  This timely appeal followed.

## DISCUSSION

Ms. Lamalfa contends the trial court erred as a matter of law by admitting into evidence the four medical records at issue and that she was prejudiced by their admission.  First, and as a threshold matter, she argues that Ms. Hearn failed to authenticate the records pursuant to Rule 5-902.  Second, she argues that the records were not admissible under Rule 5-703(b) or under the business records exception to the hearsay rule.  She seeks a reversal and remand for a new trial on damages.

Ms. Hearn responds that Ms. Lamalfa failed to preserve her authentication challenge because she did not make that argument at trial. She maintains, moreover, that the admission of the medical records was proper under Rule 5-703(b), as "facts or data" relied upon by Dr. Halikman; under Rule 5-803(b)(3), as statements of Ms. Lamalfa's then existing physical condition, specifically her bodily health; under Rule 5-803(b)(6), as business records; and under the catch-all exception to the rule against hearsay in Rule

-11-

5-803(b)(24). Finally, she asserts that even if the records were admitted in error, Ms. Lamalfa has failed to make any showing as to how she was prejudiced by their admission given that the jury found her (Ms. Hearn) responsible for damages related to Ms. Lamalfa's shoulder injury and her hernia repair.

Authentication is a "condition precedent to admissibility" and may be "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Md. Rule 5-901(a). Ms. Lamalfa asserts for the first time on appeal that Ms. Hearn failed to have the medical records at issue certified as business records under the self-authentication provisions of Rule 5-902(b). She did not make this argument when defense counsel moved for the admission of the Mercy record or the other three records. Rather, she argued that the records were inadmissible because they were "hearsay document[s]" and because any probative value they might have was outweighed by their prejudicial impact. Having failed to object below on the basis of authentication, she has not preserved that issue for appeal. Md. Rule 8-131(a).

Ms. Hearn moved for the admission of the medical records pursuant to Rule 5-703, entitled "Bases of Opinion Testimony by Experts." Section (a) of that rule provides generally that the "facts or data" on which an expert witness bases his opinion may be those made known to him before trial. Subsection (b) of the rule is captioned "Disclosure to Jury." It states:

> If determined to be trustworthy, necessary to illuminate testimony, and
> unprivileged, facts or data reasonably relied upon by an expert pursuant to
> section (a) may, in the discretion of the court, be disclosed to the jury even
> if those facts and data are not admissible in evidence. Upon request, the
> court shall instruct the jury to use those facts and data only for the purpose

-12-

of evaluating the validity and probative value of the expert's opinion or inference.

In *Alban v. Fiels*, 210 Md. App. 1, 21 (2013), we explained the effect of Rule 5-703(a) and (b) as follows:

> Most certainly, "[a]n expert may give an opinion based on facts contained in reports, studies, or statements from third parties, if the underlying material is shown to be of the type reasonably relied upon by experts in the field." *United States Gypsum Co. v. Mayor and City Council of Baltimore*, 336 Md. 145, 176, 647 A.2d 405 (1994). The focus of the language in Rule 5–703(a) that facts or data forming the basis for an expert's opinion may be relied on if "of a type reasonably relied upon by experts in the particular field" ordinarily relates to hearsay evidence. *Attorney Grievance Comm'n v. Nothstein*, 300 Md. 667, 682, 480 A.2d 807 (1984). If such information received from others is inadmissible hearsay, "it ordinarily comes in not as substantive evidence but only to explain the factual basis for the testifying expert's opinion." *United States Gypsum Co.*, 336 Md. at 176 n. 10, 647 A.2d 405. Regardless of why the facts or data within the meaning of Rule 5–703(a) are not admissible as substantive evidence, when they are permitted for Rule 5–703(a) purposes, they are not admitted as substantive evidence. Thus, "[u]pon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference." Rule 5–703(b).
>
> In other words, Rule 5–703(a) does not operate to admit as substantive evidence facts or data that are otherwise inadmissible. The facts or data relied upon are admissible, if at all, only to explain how the expert reached an opinion. Thus, unless inadmissible as a matter of law, inadmissible evidence, if it satisfies Rule 5–703, may be admitted, in the court's discretion, to explain the factual basis for an expert's opinion.

As the rule itself makes clear, for "facts or data" to qualify, they "must be (1) trustworthy, (2) unprivileged, (3) reasonably relied upon by an expert in forming her or his opinion, and (4) necessary to illuminate that expert's testimony." *Brown v. Daniel Realty Co.*, 409 Md. 565, 601 (2009). Ms. Lamalfa concedes that the medical records were not privileged and that Dr. Halikman reasonably relied upon them. She argues that

Ms. Hearn failed to establish the trustworthiness of the medical records or that they were necessary to illuminate Dr. Halikman's testimony. Ms. Lamalfa did not make either such argument below, even though she did offer reasons for her objection. This argument is not preserved for review.

The argument lacks merit in any event because it is plain that medical records prepared by Ms. Lamalfa's treating health care providers in the immediate aftermath of the accident were sufficiently trustworthy to satisfy Rule 5-703. Moreover, because Dr. Halikman relied upon those records to form his opinion that Ms. Lamalfa was not exhibiting symptoms of an acute traumatic injury to her right shoulder or to her abdomen immediately after the accident or, with respect to her abdomen, months later, they were necessary to aid the jurors in understanding that opinion.

Ms. Lamalfa further argues that the court abused its discretion by admitting the medical records into evidence because Rule 5-703(b) permits *disclosure* of records within its ambit to the jury, not *admission* of such records. She maintains that if the court merely had disclosed the medical records to the jury, the records would not have been with the jurors during deliberation and they could not have used them substantively in reaching their verdict.

To be sure, section (b) of the rule permits "disclosure" to the jurors, not "admission," of "facts or data" reasonably relied upon by a testifying expert witness. In cases in which the facts or data the expert relied upon are contained in a written document, the Court of Appeals and this Court have not drawn a distinction between disclosing the writing to the jury and admitting the writing in evidence. In *Brown*, 409

Md. 565, the Court upheld a ruling by the circuit court admitting in evidence a lead inspection report of the subject property in a lead paint case that had been relied upon by a testifying expert witness in forming his opinions. The Court explained that "four elements must be satisfied for a document to be *admissible* under [Rule 5-703]." *Id.* at 601 (emphasis added). Likewise, in *Gillespie v. Gillespie*, 206 Md. App. 146, 166 (2012), we held, in a custody case, that the "circuit court was permitted to admit" under Rule 5-703, a report documenting a psychiatric evaluation of the mother because a testifying expert had relied upon it in forming her opinions.

There is no significant difference between disclosure and admission of a writing under Rule 5-703 because to be able to use the writing to assess the credit, if any, to be accorded the opinion of the expert witness who relied upon it, the fact finder must be able to read the document, not just glance at it in passing. What *is* significant is that the writing is not to be used substantively (unless otherwise admissible for its substance). It is for that reason that the rule directs that, "[u]pon request, the court shall instruct the jury to use th[e] facts and data [relied upon by the testifying expert] only for the purpose of evaluating the validity and probative value of the expert's opinion or inference." Md. Rule 5-703(b).

Here, the essence of Ms. Lamalfa's complaint is that the jurors could have misused the contents of the medical reports because the reports were with them in the jury room during deliberations. Any problem with how the jurors might have used the reports was not a function of their being in the jury room but of Ms. Lamalfa's failure to request a limiting instruction under Rule 5-703(b) either upon their admission, at the

-15-

close of the evidence, or during defense counsel's closing argument. Had she done so, the court would have been required to instruct the jurors not to use the medical reports substantively—the very concern she now raises on appeal. Thus, her failure to request a limiting instruction is a waiver of this issue on appeal. *See Brown,* 409 Md. at 603–04 (plaintiff waived challenge to the manner in which defendants used lead paint report when she failed to request a limiting instruction or to object to allegedly improper closing argument).

For these reasons, the trial court did not abuse its discretion by admitting the medical records in evidence under Rule 5-703.[5] Accordingly, we shall affirm the judgment.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

[5] For this reason it is not necessary for us to address the hearsay arguments.